Receipt number AUSFCC-10940827

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DGCI Corporation | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

**25-2103C**

Case No._____

## COMPLAINT

Plaintiff, DGCI Corporation ("DGCI"), brings this monetary claim challenging the Contracting Officer's Final Decision ("COFD"), dated March 20, 2025, issued under the Contract Disputes Act ("CDA") by the Defendant, United States of America, acting by and through the Defense Logistics Agency - Energy (hereinafter DLA-Energy, DLA-E or Agency) under Contract no. SPE605-20-D-9518 (hereinafter "Contract") in response to Plaintiff's certified CDA claim for the sum certain amount of $7,331,663. The Contract is for supply and delivery of various fuel products to the U.S. military in Iraq. CLIN 0006 of the Contract is for supply and delivery of JP8, an Aviation Turbine Fuel (jet fuel) to Al Asad, which the claim pertains. For its Complaint against Defendant, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.  DGCI Corporation brings this appeal of the COFD denying DGCI's claim made pursuant to the Contract's Economic Price Adjustment ("EPA") clause, ¶ (g)(4), that DGCI is entitled to a price adjustment of $7,331,663 for the jet fuel supplied and delivered under CLIN 0006 of the Contract. Under the Contract's EPA Clause, ¶ (g)(4), upon the

occurrence of the specified contingency – "the reference price consistently and substantially failed to reflect market conditions" – DLA-E is liable to DGCI for the difference between a mutually agreeable "appropriate and comparable" substitute of the Contract's reference price and the Contract's reference price. PLATTS Arab Gulf is the Contract's reference price. The market conditions under the Contract's EPA Clause, ¶ (g)(4), are those of the Iraqi Government's Oil Products Distribution Center ("OPDC"), which, beginning in 2021, has a monopoly over the jet fuel as Iraqi law requires that the jet fuel be purchased exclusively from OPDC where it is used within Iraq, in this case, Al Asad. OPDC is the appropriate and comparable substitute.

### SUMMARY OF THE CASE[1]

2.     This requirements Contract required Plaintiff to supply and deliver jet fuel under CLIN 0006 to Al Asad, Iraq. Paragraph (c) of the Contract's Economic Price Adjustment ("EPA") Clause requires DLA-E to compensate DGCI based on the "award price" <u>adjusted</u> upward or downward by the "reference price" -- a "market price" which was established by the EPA Clause to be "PLATTS Arab Gulf." Under ¶ (c), the adjustment in the award price is made by the amount PLATTS increased or decreased at the time of delivery. The phrase "reference price" is also known as the "escalator."

3.     The Contract's EPA Clause, ¶ (g)(4), makes allowance for a <u>second</u> economic price adjustment – the basis of DGCI's claim. Under ¶ (g)(4), upon the occurrence of the contingency specified in EPA Clause ¶ (g)(4) -- "the reference price consistently and substantially fails to reflect market conditions" – both parties must agree

---

[1] The action is summarized in this section, and alleged with particularity in the Facts section.

upon an appropriate/comparable substitute for PLATTS, for determining the price adjustment beginning when PLATTS failed to reflect market conditions, to compensate the awardee for the difference between the failed PLATTS price and its substitute.

4.      The market conditions under the Contract's EPA clause, ¶ (g)(4), is that of the Iraqi Government's OPDC, which is part of Iraq's Ministry of Oil ("MoO").  OPDC has a monopoly on jet fuel sold in Iraq.  Under Iraqi law, all jet fuel for use in Iraq must be purchased exclusively from OPDC.

5.      The COFD improperly denied Plaintiff's claim for economic price adjustment.  Although the COFD does indicate that DLA-E considers the difference between the monthly PLATTS prices to be substantially less than the OPDC prices during the claim period, the COFD states that the difference was not consistent because it simply "varied."  PLATTS consistently failed to reflect the OPDC market conditions, beginning in November 2021 when the OPDC/PLATTS monthly difference is considered, by DLA-E, to be substantial ($0.444999) and for every subsequent month until October 2023, the difference was consistently greater than $0.444999.  Another ground for the COFD's denial is that substituting OPDC for PLATTS after award undermines the integrity of the acquisition process.  It does not, for the simple fact that at the time of proposal preparation the solicitation advised offerors that the EPA Clause would be made part of the resulting contract award permitting the substitution of PLATTS.  Generally, the positions taken by the Government are predicated on the fundamentally mistaken ground that the Contract is a firm fixed price contract, reading out the EPA Clause, thus requiring DGCI to assume the risk of PLATTS consistently and substantially failing to reflect market conditions.  For example, the COFD denied DGCI's claim on the basis that Plaintiff cannot replace

PLATTS with OPDC because Plaintiff was responsible for "predicting" the market price increases, suggesting that Plaintiff should have padded its price proposal to account for the contingency that is otherwise covered by EPA Clause, ¶ (g)(4). DLA-E's position runs contrary to EPA Clause, ¶ (g)(4) which is designed to protect DGCI, from unfairly shifting to Plaintiff, price uncertainty (and thus avoid padding of proposals), where PLATTS consistently and substantially fails to reflect market conditions. Under the terms of the Contract's EPA Clause, ¶ (g)(4), DGCI does not assume such risk. The Contract that is the subject of this action is a firm fixed price requirements contract with economic price adjustment. The market conditions under the Contract's EPA clause, ¶ (g)(4), is that of Iraq's OPDC. Where the contingency is met -- PLATTS price consistently and substantially fails to reflect market conditions -- the EPA Clause, ¶ (g)(4), requires the Contract be modified to reflect a mutually agreed upon substitute for PLATTS, and entitles DGCI to the difference between PLATTS and its substitute (OPDC) starting from when PLATTS first began to be consistently and substantially less than OPDC. DGCI is not required to predict such price increases, rather, the EPA clause places responsibility on the contracting officer to make a determination after award as to whether PLATTS consistently and substantially fails to reflect market conditions (OPDC). The contracting officer has failed in his contractual responsibility.

6.      Based on the foregoing revision to the Contract's reference price, DLA-E is liable to DGCI for $7,331,663.

## PARTIES

7.      Plaintiff, DGCI Corporation, is a corporation registered under the laws of Virginia.

8.    Defendant, the United States of America, is acting by and through DLA-Energy.  DLA-Energy is the integrated material manager for energy commodities and the contracting activity for petroleum products and services for the Department of Defense.

## JURISDICTION

9.    This Court has jurisdiction under the Tucker Act to adjudicate Plaintiff's claim as it arises under the CDA, 41 U.S.C. §§ 7101-7109, which was submitted to the contracting officer for a final decision and the COFD has been issued.  See 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 . . . on which a decision of the contracting officer has been issued[.]");  see also 41 U.S.C. § 7104(b)(1) (("[I]n lieu of appealing the decision of a contacting officer ... to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims.").  See K-Con Bldg. Systems, Inc. v. United States, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (This court may hear a claim under the CDA only if that claim has been "submitted to the relevant contracting officer," and the contracting officer has "issued a final decision on that claim."

## TIMELINESS

10.    Pursuant to the Contract Disputes Act, 41 U.S.C. 7104(b)(3), the instant action is timely filed within twelve (12) months from March 20, 2025 the date of receipt of the contracting officer's final decision denying DGCI's claim for economic price adjustment under the Contract's EPA Clause.  The final decision is attached hereto as an **EXHIBIT 4.**

## STANDARD OF REVIEW

11.     Plaintiff's CDA claim is reviewed de novo by the Court, including both facts and law.  See 41 U.S.C. § 7104(b)(4).  See also, Seaboard Lumber Co. v. United States, 93 F.2d 1560, 1562 (Fed. Cir. 1990).  For this reason, the contracting officer's decision is afforded no deference; the findings of fact in the contracting officer's decision are not binding in any subsequent court proceeding, and are not entitled to any deference. See 41 U.S.C. § 7103(e).  See also, Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (citing the predecessor statute, 41 U.S.C. § 605(a), which contains language identical to that of § 7103(e), the court states that findings of fact in the contracting officer' decision "are not binding in any subsequent court proceeding," and "are not entitled to any deference.")  The "contractor has the burden of proving the fundamental facts of liability and damages de novo."  Wilner, 24 F.3d at 1401.  In Sikorsky Aircraft Corporation v. United States, Judge Lettow explains:

> As this court has previously noted, however, "[a]lthough it is true that 'once an action is brought following a contracting officer's decision, the parties start in [this] court ... with a clean slate,' de novo consideration of a claim does not wholly ignore what the contracting officer actually did," and, as such, any claim that the COFD "is irrelevant to this court's *de novo* review" is without merit.  Mansoor Int'l Dev. Servs., Inc. v. United States, 121 Fed. Cl. 1, 6 (2015) (quoting Wilner, 24 F.3d at 1402).

170 Fed. Cl. 257, 262–63 (2024).

## FACTS

12.    The facts are organized under subheadings and are included for organizational purposes, only.

**The Solicitation**

13.    DLA-E issued solicitation no. SPE605-19-R-0212 (hereinafter "Solicitation"), on April 1, 2019, requesting proposals for supply and delivery of various fuel products to the United States military throughout Western, Northern, and Central Iraq.

14.    Of relevance to the instant action is solicitation CLIN 0007 (awarded as CLIN 0006 under the Contract) which required 53,460,000 US Gallons of jet fuel ("JP8") for delivery to Al Asad Air Base, Iraq.  The quantity was later increased to 59,479,931 after award under contract modification P00014.

15.    DLA-E issued the solicitation as a commercial item procurement, contemplating the award of one or more requirements-type, fixed-price contracts with economic price adjustment to the responsible offeror or offerors on a Lowest-Price Technically Acceptable ("LPTA") basis to supply a variety of fuel products during a 3-year ordering period, including JP8, an Aviation Turbine Fuel, with NSN 9130-01-031-5816, for delivery to Al Asad, Iraq under CLIN 0007.[2]

16.    The original date set for receipt of proposals was April 30, 2019, later changed to May 20, 2019 under solicitation amendment 0003.

---

[2] See Solicitation at 15 (B-0002, B19.02, Economic Price Adjustment (Overseas) (DLA Energy Jan 2012), 73 (FAR Clause 52.216-21, Requirements (Oct 1995), 85 (three year ordering period from date of award), 163 (FAR Clause 52.216-1, Type of Contract) and 167 (multiple awards); Solicitation Amendment 0005 at 5 (FAR Clause 52.212-2 and LPTA scheme); Solicitation Amendment 0008 at 3 (CLIN 0007), 10, ¶ 1 (reserving right to make multiple awards).

17.    DLA-E received nineteen (19) proposals in response to the Solicitation.

18.    The solicitation informed offerors that the fuel products were required to be made on a monthly basis, including the JP8 of CLIN 0007.  See Solicitation Amendment 0004 at 3.

19.    Because of the volatility of prices for the solicited fuel products, the solicitation includes an Economic Price Adjustment ("EPA") Clause.

20.    The presence of (and the contracting officer's decision to include) the EPA Clause in the solicitation informed offerors that the contracting officer had serious doubt of the stability of market conditions that will exist during performance -- market changes were seriously unpredictable.

21.    The terms of the EPA Clause includes two economic price adjustments with the first under EPA Clause, ¶ (c) and the second under ¶ (g)(4).

22.    The second economic price adjustment, EPA Clause, ¶ (g)(4), is the primary focus to DGCI's claim.

**EPA Clause, ¶ (c) – First Economic Price Adjustment**

23.    EPA Clause, ¶ (c), establishes the **first economic price adjustment**, which contemplates price adjustment based on PLATTS, on what amounts to a continuous, monthly basis throughout the Contract's period of performance, and  the extent to which PLATTS increases or decreases.

24.    EPA Clause, ¶ (c), defines the "prices payable" under the Contract as follows:

> ADJUSTMENTS.  The prices  payable under this contract shall be the *award price* increased or decreased by the amount, determined according to the following formula, that

> the *reference price* shall have increased or decreased, to and
> including the date of delivery.

Solicitation ("Sol.") at PDF 15 (emphasis added).  See also, Contract at PDF 23.

25.     The solicitation's EPA Clause, ¶ (k), advised offerors that the "reference price" (or escalator) for CLIN 0007 is PLATTS Arab Gulf (hereinafter "PLATTS") as of March 1, 2019 amounting to $1.805952 per US Gallon ("USG").  See Solicitation at PDF 18.  See also, Contract at PDF 25.

26.     EPA clause ¶(b)(1) defines "award price" as follows

> Award price means the unit price offered by the Contractor
> and set forth opposite the item in the Schedule supplied by
> the Contractor, with which the award price is to fluctuate.

Sol. at PDF 15.  See also, Contract at PDF 23.

27.     EPA clause ¶ (b)(2) defines "reference price" as follows:

> Reference price means the market price, this is either
> published in an independent publication or supplied by the
> Contractor, with which the award price is to fluctuate.  The
> reference price should be a market price for the same or
> similar product(s) as the item being purchased.

Sol. at PDF 15.  See also, Contract at PDF 23.

28.     EPA Clause, ¶ (k) states, in relevant part:

> PLATTS' product prices will escalate monthly based on the
> average of high and low assessments contained in the Platt's
> publication of each month in which deliveries are made.
> Therefore, the effective price for the period of the 1st through
> the 30th/31st will be the average of the high and low
> assessment for the previous month's assessments posted on
> the 1st of each month.  Saturdays and Sundays shall be
> considered as Platt's non-publication days.  If assessments
> are not posted by Platts during the period that delivery was
> made due to a holiday or another occurrence, only the posted
> assessments for that period will be used in the calculation.

Sol. Amendment 00012 (adding "calculation" at the end of the last sentence).

**EPA Clause, ¶ (g)(4) – Second Economic Price Adjustment**

29.     In drafting the EPA Clause, the agency included ¶ (g)(4) that establishes a

**second economic price Adjustment.**

30.     EPA Clause, ¶ (g)(4), states, in relevant part, as follows:

> (g) REVISION OF REFERENCE PRICE INDICATOR
>
> In the event —
>
> * * *
>
> (4) The Contracting Officer determines that the reference price consistently and substantially failed to reflect market conditions—
>
> the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described hereunder. The contract shall be modified to reflect such substitute effective on the date the indicator was discontinued, altered, or began to consistently and substantially fail to reflect market conditions. If the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes paragraph of the CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS clause of this contract.

Sol. at PDF 17.  See also, Contract at 24.

31.     **(a)** DLA-E included this second economic price adjustment in ¶ (g)(4),

recognizing that the contract's escalator chosen by the DLA-E might not be appropriate or

fair where it consistently and substantially fails to reflect market conditions.  **(b)** Upon the

occurrence of this contingency, ¶ (g)(4) requires the parties to mutually agree upon an

appropriate and comparable substitute for determining the price adjustment and where, as

in the instant action, PLATTS is consistently and substantially less than OPDC, DLA-E is

liable to DGCI for the difference between OPDC and PLATTS prices, effective when

PLATTS first began to consistently and substantially fail to reflect market conditions.

32.    **(a)** The Defense Energy Support Center ("DESC") (currently named DLA-Energy) previously opined that this specific provision of the EPA Clause is intended to provide a remedy to address the circumstances under the market conditions experienced by Plaintiff.  **(b)** At the time DLA proposed its Economic Price Adjustment Clause for Rulemaking in 1995, a commenter of DLA's proposed EPA Clause inquired about the risk of unfairly shifting to the contractor --  price uncertainty -- where a contracting officer selects an inappropriate market price indicator.  **(c)** [The market price indicator that DLA-E included in the Contract is PLATTS.]  **(d)** DLA's response relied on the same language that appears in paragraph (g)(4) of the subject Contract's EPA Clause and assured that DLA's proposed EPA clause -- containing language authorizing the contracting officer to substitute an appropriate indicator when the contract's price indicator for economic price adjustment fails to reflect market conditions -- adequately addressed this risk.  **(e)** The Comment and DLA's response follow[3]:

> The National Security Industrial Association [the commentor] is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the **price available to the contractor**.  They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."
>
> [DESC] responds that the commenter seems concerned about implementing the market price concept, not the concept itself. ... In any event, [DESC's] EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions. .... Accordingly, the comment does not warrant revising the proposed DLAR coverage.

---

[3] DESC provided DAR Council with a revised memorandum on May 12, 1995, addressing the one public comment received in response to DLA's proposed rule.

(emphasis added).  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995 (emphasis added).

33.    The contracting officer is required to reasonably and faithfully execute the contract responsibilities placed upon him, including those found in EPA Clause, ¶(g)(4). The contracting officer has failed to do so.

34.    Paragraph (g)(4) of the EPA Clause places contractual responsibility on the "contracting officer to determine[] [whether] . . . the reference price consistently and substantially failed to reflect market conditions . . . ."

35.    In the event the reference price consistently and substantially fails to reflect market conditions – the specified contingency -- EPA Clause, ¶ (g)(4), makes DLA-E liable to DGCI for the "price adjustment," the difference between PLATTS and the mutually agreed upon substitute for PLATTS, effective when PLATTS began to consistently and substantially fail to reflect market conditions, through a contract modification.

36.    Paragraph (g)(4) of the EPA Clause places contractual responsibility on the contracting officer to reasonably decide whether to agree with DGCI that OPDC should replace PLATTS.

37.    Paragraph (g)(4) further requires that upon making such a determination, the Contract be "modified to reflect such substitute effective on the date the indicator . . . began to consistently and substantially fail to reflect market conditions."  Cf. COFD at 8 (DLA-E improperly stating that under ¶ (g)(4) "DGCI's claim would effectively increase its offer price . . . .")

38. Paragraph (g)(4) requires that DGCI be paid the difference between the substitute and PLATTS effective when PLATTS first began to consistently and substantially fail to reflect market conditions.

**Termination for Convenience of the Initial Two Contract Awards**

39. On December 12, 2019, DLA-E informed DGCI that it was not the lowest price offeror.

40. The resulting contract was awarded to Strategic Social, LLC for 50% of the work. Said contract was contract no. SPE605-20-D-9507. The remaining 50% of the work was awarded to Varec, Inc. under contract no. SPE605-20-D-9508.

**The Contract Award to DGCI**

41. On March 23, 2020 DLA-E inquired as to whether DGCI's prices are still valid.

42. On March 23 and 24, 2020 DGCI (i) confirmed its prices are still valid and (ii) indicated there are no changes to its prices, respectively.

43. On March 24, 2020, DLA-E terminated for its convenience contract nos. SPE605-20-D-9507 and SPE605-20-D-9508.

44. DLA-E awarded DGCI the Contract with an effective date of award of April 7, 2020.

45. The award price for CLIN 0006 amounts to: $3.369017 per US Gallon.

46. CLIN 0006 under the Contract required supply and delivery of 59,479,931 US Gallons of "Aviation Turbine Fuel", NSN 9130-01-031-5816 ("JP8") to AL ASAD AIR BASE, Al Asad. See Contract Modification P00014 at 6.

47. A total of fifteen (15) modifications were issued under the Contract.

48.     The Period of Performance under the Contract is April 8, 2020 to April 7, 2023, later extended to October 7, 2023.

49.     The Contract is a firm-fixed price requirements contract with Economic Price Adjustment.

50.     The Contract includes FAR Clause 52.216-21, "Requirements (Oct 1995." See Contract at PDF 67-68.

51.     The Contract includes Clause B19.02, "Economic Price Adjustment (Overseas) (DLA Energy Jan 2012), hereinafter "EPA Clause".  Contract at PDF 6-11.

52.     A material term of the Contract is the EPA Clause.

53.     The Contract's "reference price" for CLIN 0006 (JP8) is PLATTS as of March 1, 2019 amounting to $1.805952.  See Contract at PDF 8.

54.     EPA Clause, ¶ (k) (See Contract at 25) provides the same reference price for the "JP8" as set forth on page 8 of the Contract , namely, PLATTS as of March 1, 2019 amounting to $1.805952, and references the JP8 as CLIN "0007" instead of "0006." See Contract at PDF 25.

**DGCI's CDA Claim and COFD**

55.     On May 22, 2023, DGCI submitted its Request for Economic Price Adjustment ("REPA")  under CLIN 0006 amounting to $5,527,502.11 for the period of November 2021 through April 2023 and stated the submission is a "Request for Economic Price Adjustment" and that it is "not a claim under the Contract Disputes Act.".  See **EXHIBIT 1.**

56.    The April 1, 2024 supplement to DGCI's REPA increases the quantum amount of DGCI's May 2023 REPA to $7,331,663.71 by adding the OPDC/PLATTS price difference for the period of May 2023 to October 2023.  See **EXHIBIT 2.**

57.    In response to DLA-E's request of April 18, 2024, on July 31, 2024, DGCI provided voluminous, supporting documentation of the monthly quantities of jet fuel that DGCI purchased from OPDC as required by the delivery orders.  These quantities are shown in the "USG" column of the Table below.

58.    On December 19, 2024, DLA-E responded to DGCI's Request for Economic Price Adjustment, improperly designating its response to be a "final decision."

59.    On February 25, 2025, DGCI explained that the contracting officer lacked the authority to issue a final decision given that DGCI had only submitted a Request for Economic Price Adjustment and not a CDA claim.  See **EXHIBIT 3.**

60.    **(a)** On February 25, 2025, DGCI converted its Request for Economic Price Adjustment as supplemented in the amount of $7,331,663.71 into a certified claim under the Contract Disputes Act and submitted it the same day.  See **EXHIBIT 3.  (b)** DGCI's CDA claim requested a final decision and included the required CDA  certification.  Id.

61.    On March 20, 2025, the contracting officer issued the COFD in response to DGCI's certified claim submitted under the Contract Disputes Act on February 25, 2025.  See **EXHIBIT 4**.

**Liability**

62.    FAR 16.203-1(a) states:

A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies.

(emphasis added).

63.    EPA Clause ¶ (g)(4) requires the following method of analysis:   to determine whether revision of the escalator is required, compare the monthly PLATTS price with the monthly OPDC price during performance and where, as here, the specified contingency occurs -- PLATTS prices are consistently and substantially less than the OPDC prices -- DLA-E is liable to DGCI for the price adjustment -- the difference between OPDC and PLATTS monthly prices -- effective when PLATTS first began to be consistently and substantially less than OPDC prices, an appropriate and comparable substitute.

64.    Under the Contract's EPA clause, ¶ (g)(4), DLA-E is liable to DGCI for the difference between the Contract's reference price, PLATTS, and its appropriate and comparable substitute, which, in this case, is the Iraqi Government's OPDC.

65.    Under the Contract's EPA Clause, ¶ (g)(4), for the period beginning November 2021 to October 2023, the PLATTS reference price consistently and substantially failed to reflect market conditions, thereby making DLA-E liable to DGCI for the difference between the OPDC and PLATTS prices, effective when PLATTS began to fail.

66.    As explained in DGCI's claim letter, and DGCI alleges herein, the Contract's EPA Clause, ¶ (g)(4), requires the contracting officer to substitute PLATTS

with an appropriate and comparable, mutually agreed upon, substitute, which in the instant action is OPDC, where, as here, PLATTS consistently and substantially failed to reflect market conditions (i.e., OPDC monthly prices) for determining the price adjustment, effective when PLATTS began to fail (November 2021). Accordingly, in its claim letter, DGCI requested the contracting officer to substitute PLATTS with OPDC and to compensate DGCI the OPDC/PLATTS price difference effective November 2021 through October 2023, the claim period.

67.    As stated in DGCI's claim letter, and DGCI alleges herein: "The market conditions under the Contract's EPA clause is that of Iraq's OPDC."

68.    **(a)** Under the Contract's EPA Clause, ¶ (g)(4), PLATTS consistently and substantially failed to reflect market conditions (i.e., is less than OPDC) during the period of November 2021 through October 2023, thereby making DLA-E liable to compensate DGCI the OPDC/PLATTS price difference effective November 2021, through October 2023. **(b)** Alternatively, under the Contract's EPA Clause, ¶ (g)(4), PLATTS consistently and substantially failed to reflect market conditions during the period of January 2022 through October 2023, thereby making DLA-E liable to DGCI for the OPDC/PLATTS price difference effective January 2022, through October 2023.

69.    **(a)** A review of the OPDC/PLATTS monthly price differences begins immediately after award with the first batch of jet fuel purchased in May 2020 as shown in the Table below. **(b)** As indicated in DGCI's claim letter, as shown in the Table below it is not until months later in November 2021 (having an OPDC/Price difference of $0.444999) when, for the first time, the OPDC/PLATTS monthly price difference began to be underlined consistent, with all subsequent months through October 2023 the OPDC/PLATTS

price difference being greater than November 2021's price difference of $0.444999. [For January 2022 the OPDC/PLATTS difference was $0.420020, essentially the same OPDC/PLATTS difference as November 2021.] **(c)** Alternatively, if this negligible difference is considered to fall outside the realm of being "consistent[]" under EPA Clause, ¶ (g)(4), then the first time the OPDC/PLATTS price difference began to be consistent is January 2022, with all other subsequent months through October 2023 the OPDC/PLATTS price difference being greater than the January 2022 OPDC/PLATTS price difference ($0.420020).

70.    **(a)** As reflected **in the COFD (p. 4)**, DLA-E considers the magnitude of the November 2021 OPDC/PLATTS price difference ($0.444999) to be substantial. **(b)** Each subsequent OPDC/PLATTS monthly price difference is greater than the November 2021 OPDC/PLATTS monthly price difference. **(c)** Thus, the PLATTS monthly prices during the period of November 2021 to October 2023 consistently and substantially failed to reflect market conditions (i.e., OPDC prices).

70.1    **(a)** As reflected **in the COFD (p. 4)**, DLA-E considers the magnitude of the January 2022 OPDC/PLATTS price difference ($0.420020) to be substantial. **(b)** Each subsequent OPDC/PLATTS monthly price difference is greater than the January 2022 OPDC/PLATTS monthly price difference. **(c)** Thus, the PLATTS monthly prices during the period of January 2022 to October 2023 consistently and substantially failed to reflect market conditions (i.e., OPDC prices).

71.  **In the COFD (p. 4)**, DLA-E finds that a magnitude of $0.1982085 is substantial.  DLA states $0.389144 [4] is "<u>significantly</u> lower than the historical price difference." (emphasis added).  The historical price difference (which the COFD expresses in terms of averages) amounts to $0.5873525.[5]  The difference between $0.389144 and $0.5873525 is <u>$0.1982085</u>.

72.  The Federal Circuit has held that the "ordinary meaning" of the term " 'substantially' can mean '<u>significantly</u>' or 'considerably.' " (emphasis added).  <u>Deering Precision Instruments v. Vector Distribution Systems</u>, 347 F.3d 1314 at 1322-23 (Fed. Cir. 2003).  The term substantially also has the "dual ordinary meaning . . . of "approximation or a term of magnitude."  <u>Id.</u> at 1323.  In the instant action, under EPA Clause, ¶ (g)(4), "substantially" is obviously used as a term of magnitude, imposing on the contracting officer the duty to determine whether PLATTS "consistently and substantially fails to reflect market conditions."

73.  Under another contract for Aviation Turbine Fuel that includes the same EPA Clause, DLA-E considers the magnitude of $0.076422 substantial.  See Contract SPE605-18-D-9506, Mod. P00004 (Aviation Turbine Fuel; changing Platts Arab Gulf escalator of $1.464253 to the Platts Mediterranean escalator of $1.540675).

---

[4] **In the COFD (p. 4)**, DLA-E describes this amount as the average difference between OPDC and PLATTS during the initial months of the contract and the numeric value is found **in the COFD (p. 7)**.

[5] The historical prices are reflected in **the COFD (p. 5)** as averages.  There are two historical averages in **the COFD (p. 5)** as follow: $0.625804 and $0.548901.  The total historical price amounts to $0.5873525, computed as follows: ($0.625804 <u>PLUS</u> $0.548901) <u>DIVIDED BY</u> 2.

74.     Additionally, in the fuel energy market a reasonable person considers the magnitude of $0.1982085 and $0.076422 substantial.

75.     The Iraqi Government's OPDC is part of Iraq's Ministry of Oil ("MoO"), and has a monopoly on jet fuel sold in Iraq.

76.     As stated in DGCI's claim letter, and DGCI alleges herein, "OPDC prices [are] an appropriate and comparable market indicator."

77.     **(a)** DLA-E recognizes that prices established by a Government body may be used as an escalator (i.e., reference price) under an EPA Clause. **(b)** The Oil Products Distribution Center ("OPDC") is part of Iraq's Ministry of Oil ("MoO"). DLAD 5416.203-4 (S-90) specifically permits the use of Iraq's OPDC as a reference price:

> When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 5416.203–1(a) (S–90) or (c)(S–90). Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The <u>established price</u> or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, <u>by</u> an independent trade association, <u>Governmental body</u>, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.

(emphasis added).

77.1     The market conditions under the Contract's EPA clause are those of Iraq's OPDC.

a.     DLA-E is aware, through its communication(s) with the State Department's US Embassy in Iraq, Logistics Management Center ("LMC") — who is

responsible for coordinating the process of selling fuel between OPDC and DLA — that as of the date the solicitation was issued in April 2019 Iraqi law mandated that jet fuel contracted for delivery within Iraq must be purchased exclusively from OPDC, a monopoly. (ii) This monopoly existed as of the date DGCI prepared its offer through the date of award, and the OPDC prices reflected the market conditions in Iraq. See COFD at 10 (stating that monopoly market condition existed at time of proposal preparation). (iii) The Arab Gulf market (PLATTS) for jet fuel is separate from the market of Iraq OPDC jet fuel.

b.    As stated in DGCI's claim letter, and as alleged herein: (i) The 2021 DoD IG document explained that under Iraqi law, all jet fuel contracted for delivery in Iraq must be purchased from OPDC. See, Department of Defense Inspector General, "Audit of Defense Logistics Agency Award and Management of Bulk Fuel Contracts in Areas of Contingency Operations," (23 September 2021) at 5, stating, in relevant part:

> Fuel contracted for delivery in Iraq is a complex and time-consuming process because the Iraqi government does not allow imports of non-Iraqi fuel into Iraq. <u>Contractors must procure fuel from the Iraqi government.</u> After DLA issues the order for fuel, <u>contractors source all fuel types through the Oil Products Distribution Center ("OPDC")</u> with monthly fuel allocations that the Iraqi Ministry of Oil must approve.

(emphasis added). (ii) DOD IG's "Audit Report" of "DLA Energy's Bulk Fuel Contracts" notes that DLA Energy's contracting officers are aware of the fuel purchase requirements required by the Iraq Ministry of Oil – i.e., market conditions:

> Contractors must comply with Iraqi government law when moving, purchasing, and contracting for fuel in Iraq, and DLA Energy contracting officers were aware of the requirement. ... <u>The OPDC required contractors to purchase aviation fuel exclusively from OPDC.</u>

Id. at 17 (emphasis added).

        c.      Later on, DLA began using OPDC as the reference price as reflected by solicitations issued in 2023 and 2024:  SPE607-23-R-0201, SPE605-23-R-0210 and SPE607-24-R-0202.

**Damages**

78.     In compliance with the mandate of Iraqi law discussed above, DGCI purchased CLIN 0006's jet fuel requirement exclusively from the Iraqi Government's OPDC.

79.     The Table below was included in DGCI's claim letter as supplemented thereto.

80.     As indicated in DGCI's claim letter and as alleged herein, the Table below provides a comparison of PLATTS and OPDC jet fuel showing that during the period of November 2021 to October 2023:  (i) PLATTS prices are consistently and substantially less than OPDC prices effective November 2021 through October 2023; and (ii) the damages suffered by DGCI amounts to $7,331,663.71 -- the sum total of the OPDC/PLATTS price differences incurred by DGCI.

81.     **(a)** DGCI paid the monthly OPDC prices shown in the Table below in acquiring the jet fuel that was delivered to Al Assad for the quantity required by the monthly delivery orders.  **(b)** DGCI purchased from OPDC 22,919,712 US Gallons of jet fuel during the period of November 2021 to October 2023, delivering the fuel to Al Assad in satisfaction of CLIN 0006's requirement for jet fuel.  **(c)** This amounts to 38.53% of CLIN 0006's requirement of 59,479,931 USG of jet fuel.

82.    The quantity of the monthly delivery orders is shown in the USG column
of the Table below.

83.    Table

| Month | OPDC Price per Liters (OPDC Finance Letter) | OPDC Price per US Gallon ("USG") | PLATTS price per USG (Available through DLA Energy's Tool, "Prices to Web") | OPDC Price per USG Less PLATTS Price per USG | USG | Economic Price Adjustment |
|---|---|---|---|---|---|---|
| May-20 | $0.22 | $0.832791 | $0.367576 | $0.465215 | n/a | n/a |
| Jun-20 | $0.22 | $0.832791 | $0.566935 | $0.265856 | n/a | n/a |
| Jul-20 | $0.30 | $1.135623 | $0.936935 | $0.198688 | n/a | n/a |
| Aug-20 | $0.37 | $1.400602 | $1.006935 | $0.393667 | n/a | n/a |
| Sep-20 | $0.34 | $1.287040 | $0.976935 | $0.310105 | n/a | n/a |
| Oct-20 | $0.33 | $1.249186 | $0.896935 | $0.352251 | n/a | n/a |
| Nov-20 | $0.35 | $1.324894 | $0.946935 | $0.377959 | n/a | n/a |
| Dec-20 | $0.37 | $1.400602 | $1.046935 | $0.353667 | n/a | n/a |
| Jan-21 | $0.44 | $1.665581 | $1.226935 | $0.438646 | n/a | n/a |
| Feb-21 | $0.49 | $1.854852 | $1.336935 | $0.517917 | n/a | n/a |
| Mar-21 | $0.49 | $1.854852 | $1.336935 | $0.517917 | n/a | n/a |
| Apr-21 | $0.56 | $2.119830 | $1.506935 | $0.612895 | n/a | n/a |
| May-21 | $0.52 | $1.968414 | $1.536935 | $0.431479 | n/a | n/a |
| Jun-21 | $0.53 | $2.006268 | $1.536935 | $0.469333 | n/a | n/a |
| Jul-21 | $0.59 | $2.233393 | $1.656935 | $0.576458 | n/a | n/a |
| Aug-21 | $0.61 | $2.309101 | $1.766935 | $0.542166 | n/a | n/a |
| Sep-21 | $0.55 | $2.081976 | $1.796935 | $0.285041 | n/a | n/a |
| Oct-21 | $0.62 | $2.346955 | $1.706935 | $0.640020 | n/a | n/a |
| Nov-21 | $0.690000 | $2.611934 | $2.166935 | $0.444999 | 1,127,233.00 | $501,617.56 |
| Dec-21 | $0.680000 | $2.574080 | $2.066935 | $0.507145 | 980,739.00 | $497,376.88 |
| Jan-22 | $0.620000 | $2.346955 | $1.926935 | $0.420020 | 1,337,122.00 | $561,617.98 |
| Feb-22 | $0.730000 | $2.763351 | $2.226935 | $0.536416 | 1,076,704.00 | $577,561.25 |
| Mar-22 | $0.780000 | $2.952621 | $2.476935 | $0.475686 | 976,454.00 | $464,485.50 |
| Apr-22 | $1.020000 | $3.861120 | $3.096935 | $0.764185 | 1,010,013.00 | $771,836.78 |

| | | | | | |
|---|---|---|---|---|---|
| May-22 | $1.080000 | $4.088245 | $3.116935 | $0.971310 | 749,860.00 | $728,346.52 |
| Jun-22 | $1.150000 | $4.353224 | $3.266935 | $1.086289 | 1,018,434.00 | $1,106,313.65 |
| Jul-22 | $1.270000 | $4.807473 | $3.776935 | $1.030538 | 1,008,679.00 | $1,039,482.04 |
| Aug-22 | $1.050000 | $3.974683 | $3.086935 | $0.887748 | 1,009,443.00 | $896,131.00 |
| Sep-22 | $0.990000 | $3.747558 | $3.026935 | $0.720623 | 1,459,921.00 | $1,052,052.65 |
| Oct-22 | $0.970000 | $3.671850 | $2.746935 | $0.924915 | 987,151.00 | $913,030.77 |
| Nov-22 | $0.970000 | $3.671850 | $2.846935 | $0.824915 | 938,597.00 | $774,262.74 |
| Dec-22 | $0.960000 | $3.633996 | $2.776935 | $0.857061 | 788,568.00 | $675,850.88 |
| Jan-23 | $0.840000 | $3.179746 | $2.476935 | $0.702811 | 34,012.00 | $23,904.01 |
| Feb-23 | $0.880000 | $3.331163 | $2.626935 | $0.704228 | 892,139.00 | $628,269.26 |
| Mar-23 | $0.800000 | $3.028330 | $2.447202 | $0.581128 | 473,754.00 | $275,311.71 |
| Apr-23 | $0.750000 | $2.839059 | $2.250145 | $0.588914 | 1,115,529.00 | $656,950.65 |
| May-23 | $0.730000 | $2.763349 | $2.197293 | $0.566056 | 1,272,254.00 | $720,167.39 |
| June-23 | $0.700000 | $2.649787 | $2.014448 | $0.635339 | 906,620.00 | $576,011.04 |
| July-23 | $0.720000 | $2.725495 | $2.065321 | $0.660174 | 923,111.00 | $609,414.07 |
| Aug-23 | $0.760000 | $2.876912 | $2.286281 | $0.590631 | 1,064,256.00 | $628,582.16 |
| Sept-23 | $0.940000 | $3.558285 | $2.694297 | $0.863988 | 1,094,939.00 | $946,014.59 |
| Oct-23 | $1.000000 | $3.785410 | $2.841571 | $0.943839 | 674,180.00 | $636,317.38 |
| | | | | | | |
| | Totals | | | | 22,919,712 | $16,260,908.46 |

84.     When formulating its offer amount DGCI compared the March 2019 OPDC price[6] ($2.19554 per US Gallon) and the solicitation's March 2019 PLATTS reference price ($1.805952 per US Gallon) and included in its offer the difference, or $0.389588.

85.     As a responsible government contractor, in its Request for Economic Price Adjustment, DGCI informed DLA-E that its award price includes the aforesaid difference

---

[6] The March 2019 OPDC price is for jet fuel for purchase directly from OPDC's Basra Refinery and is based on an OPDC notice of February 2019 which indicates what the actual jet fuel price is in March 2019.  This is distinguished from the historical prices in DLA's Tables 2 and 3 to the COFD (pp. 4-5) that DLA-E used for the previous contract where jet fuel was purchased from OPDC but picked up at the Baghdad International Airport ("BIAP") where OPDC had delivered it to (instead of picking up the fuel directly from the Basra Refinery).  The listed BIAP fuel price for 2/6/2019 of  $2.195539 per gallon (See COFD at 5) happens to be the same price amount as the OPDC price amount for the March 2019 Basra refinery jet fuel.

of $0.389588 and that its request for economic price adjustment is for the price amount that OPDC price exceeds the PLATTS price for which DLA-E purchased 22,919,712 gallons of jet fuel. For this reason, DGCI explained that pursuant to FAR 16.203-2(a), it had backed-out $8,929,244.76 from its gross claim amount, which is $0.389588 per gallon of the 22,919,712 gallons of jet fuel that DLA-E had already paid DGCI.

86.    FAR 16.203-2(a) states:

> In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

87.    As stated in DGCI's supplement to Request for Economic Price Adjustment, for the claim period of November 2021 to October 2023, DGCI's claim for economic price adjustment (damages) amounts to $7,331,663.71 and is computed as follows:

|  | $16,260,908.47 | [See Table] |
|---|---|---|
| LESS | $ 8,929,244.76 | [$0.389588 TIMES 22,919,712 USG] |
|  | $ 7,331,663.71 | |

88.    DGCI concurs with DLA-E's PLATTS prices for the period of November 2021 through February 2023 as set forth on page six (6) of the COFD, which reduces the above figure of $16,260,908.47 to $16,203,620.33. DGCI's damages amount to $7,274,375.57 for the period of November 2021 to October 2023, computed as follows:

|  | $16,203,620.33 | |
|---|---|---|
| LESS | $ 8,929,244.76 | [$0.389588 TIMES 22,919,712 USG] |
|  | $ 7,274,375.57 | |

89.    DGCI alleges in the alternative that the claim period begins January 2022 to October 2023[7], resulting in DGCI suffering damages in the amount of $7,102,262.27, computed as follows:

$15,210,266.43   [changed from $16,203,620.33]
LESS   $  8,108,004.16   [$0.389588 TIMES 20,811,740 USG]
$  7,102,262.27

89.1    **(a)** DGCI purchased from OPDC 20,811,740 gallons of jet fuel during the period of January 2022 to October 2023, delivering the fuel to Al Assad in satisfaction of CLIN 0006's requirement for jet fuel.   **(b)**   This amounts to 35% of CLIN 0006's requirement of 59,479,931 USG of jet fuel.

90.    Interest on the damages began accruing on February 25, 2025, upon the contracting officer's receipt of the certified CDA claim.

**COFD's Grounds For Denial and DGCI's Corresponding Allegations**

90.1    The grounds upon which the COFD denied DGCI's claim are inconsistent with and thus violate the terms of the solicitation and/or the Contract and are organized below beginning with the COFD's grounds for denial (e.g., "**In the COFD p.__**") followed by DGCI's corresponding allegations.

91.    **(A) In the COFD (p. 10)**, the contracting officer denied DGCI's claim on the ground that  "DGCI assumed the risk associated with performance under the terms and conditions of the contract."  **(B)**  Similarly, **in the COFD (p. 2)**, the contracting officer's denial of DGCI's claim is predicated on the following ground:

> This was an Indefinite Delivery (Requirements) fixed price type contract with an economic adjustment.  Under this type of contract, the price is adjusted according to a predetermined fuel indicator, but otherwise fixed.   The

---

[7] See Complaint, ¶ 69(c).

> contractor assumes most of the risk for this type of contract
> **for the price of fuel during performance**.

(emphasis added).

92.     DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

92.1    **(a)** The grounds of the COFD's denial of DGCI's claim is inconsistent with and thus violates the terms of the Contract.  **(b)** Under the terms of the Contract's EPA Clause, DGCI does not assume the risk where PLATTS is consistently and substantially less than OPDC.  DLA-E assumes that risk.  Pursuant to EPA Clause, ¶ (g)(4), because the specified contingency occurred, i.e., PLATTS is consistently and substantially less than OPDC, DLA-E is liable to DGCI for the claim amount.

93.     **(a)**  The basis of the COFD's denial of DGCI's claim violates the terms of the Contract's EPA Clause, reading out of the contract EPA clause, ¶ (g)(4).  **(b)**   See <u>Mayvin, Inc. v. United States</u>, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, <u>United States v. Menasche</u>, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting <u>Inhabitants of Montclair Tp. v. Ramsdell</u>, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

94.     The ground of the COFD's denial violates FAR 16.203-1(a), which states:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies.

95.    The contracting officer's ground for denial violates FAR 16.203-2. **(b)** As reflected by FAR 16.203-2, a purpose of an EPA Clause is to eliminate the contingency specified in the contract from offers that would otherwise be included due to *projected long term market instability*, and to cover them separately under the EPA Clause. **(c)** See, FAR 16.203-2, stating:

> A fixed-price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract.

**(d)** In <u>MAPCO</u>, Judge Bruggink explains that where a solicitation includes an EPA Clause, because occurrence of the contingency is covered by the EPA Clause, offerors are not forced to include an amount to cover the contingency in their offers:

> Without an EPA Clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs. By using an EPA clause, the Government is assured of not having to pay that contingency.

27 Fed Cl. at 413. **(e)** See also, <u>Craft Machine Works, Inc.</u>, ASBCA No. 35167, 90-2 BCA ¶ 23095, explaining:

> By use of an EPA clause in a fixed price contract, the Government seeks to attract more bidders and lower priced proposals, bereft of contingencies that would otherwise be included in the offers, FAR 16.203–2(ii). By eliminating these monetary "cushions" or contingencies which may be handled differently by each bidder, the Government also achieves a uniformity of offer (the proverbial "level playing field") which facilitates evaluation and award. In the unlikely event that price levels decline over the original period of contract performance, the EPA clause also insures that any such benefit, which ordinarily would inure solely to

the contractor, would be shared to some extent by the Government.

Id. at 115,967, n. 3.

96.     **(A)  In the COFD (p. 2)**, the contracting officer denied DGCI's claim on the ground that in formulating its offer, DGCI failed to predict OPDC prices:

> DGCI submitted its offer in May 2019, but [in formulating its offer] rather than use [PLATTS pricing] data from May 2019 or an average of the data from several preceding months, DGCI chose to use data from March 2019.  The solicitation used a March 2019 base reference price from Platts, however, DGCI had access to OPDC and PLATTS pricing for the months prior to March 2019 and for the more recent months.

**(B)**  Similarly, **in the COFD (p. 4)**, the contracting officer denied DGCI's claim on the ground that DGCI should have predicted the OPDC price based on historical pricing information:

> As outlined above, DGCI admittedly was aware of the price difference and factored this into its offer, but chose to do so using an OPDC letter from February 2019 quoting the pricing "for one Liter" rather than using information from its actual purchases in March, September, and October 2019 or the previous 12 month average, all of which were higher than the $0.3896 it built into its offer. It is the offer's responsibility to understand their offer price and the market conditions, and the fact that OPDC prices are higher than PLATTS prices.

**(C)**  Similarly, **in the COFD (pp. 9-10)**, the contracting officer denied DGCI's claim on the ground that DGCI did not formulate its offer to include a prediction of fuel price fluctuations, explaining:

> DGCI's failure to properly account for fluctuations in the fuel prices, doesn't warrant a price adjustment. DGCI was aware of the historical difference between OPDC and PLATTS at the time of bid submission and was aware of factors that could cause further fluctuation. DGCI's bid price

should have mitigated the risk associated with an increase in the price discrepancies and DLA Energy is not responsible for DGCI's failure to adequately account for the risk associated with increased price discrepancies.

\* \* \*

DGCI should have reviewed the history of the prices, and considered a more robust representation of the historical relationship between Platts and OPDC pricing when formulating its price.

\* \* \*

Failure to accurately predict the changes in the market conditions and to reasonably factor the discrepancies between the PLATTS indicator and the OPDC pricing into their offer bid price, after accepting the use of the PLATTS indicator, is not a valid reason for a price adjustment.

97.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, Williams Alaska Petroleum, Inc. v. U.S., 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

97.1    **(a)**  The grounds of the COFD's denial of DGCI's claim are inconsistent with and thus violates the terms of the Contract.  **(b)**  Judge Bruggink rejected a similar argument made by the Defense Fuel Supply Center[8] in Mapco Alaska Petroleum v. United States, 27 Fed. Cl. 405 (1992), abrogated on other grounds by Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, finding:

Unaccountably, however, defendant contends that the real cause of MAPCO's losses was its failure to bid higher enough to cover unexpected deviations in the price escalator relative to its costs.  See Craft Mach. Works, Inc., ASBCA No. 35,167, 90-3 BCA ¶ 23,095; but see American Transparents Plastic Corp., 83-2 Comp. Gen. ¶ 539 (Nov. 8, 1983) [footnote omitted]

Id. at 413.  In footnote 12, the Court discussed Craft, supra, at 115,969, stating:

---

[8] Defense Fuel Supply Center is the former name of DLA-Energy.

In <u>Craft</u>, the Government argued a position similar to that which it now argues here.   The Board addressed the argument as follows:

'The Government recognizes that the economic relief offered by its clause is wanting from an overall inflation perspective, but argues that appellant has no reason to complain since the Government placed it on notice of this fact, and appellant failed to place "contingencies" in its bid to account for this less-than-comprehensive treatment. However, the Government ignores the fact that the very purpose of the EPA clause, as stated in the regulations, is to eliminate contingencies from a bid that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA clause, FAR 16.203–2. Indeed, under FAR 16.203–2(a), the contracting officer is tasked to insure that contingencies are not duplicated by the contractor by their inclusion "in both the base price and the adjustment requested...." This raises the serious question whether the Government's purported encouragement of contingencies is consistent with its own regulations.'

<u>Id.</u>

98.    **(a)** The bases upon which the COFD denied DGCI's claim are inconsistent with and thus violate the terms of the Contract.   **(b)**   The COFD's grounds for denial impermissibly require inserting words in EPA Clause, ¶ (g)(4).   **(c)**   It does not state that the method by which an offeror formulates is price proposal is the legal standard or a pre-requisite for determining whether the PLATTS reference price may substituted.   **(d)**   The Contract's EPA Clause, ¶ (g)(4) states, in relevant part:

(g) REVISION OF REFERENCE PRICE INDICATOR

In the event—

* * *

(4) The Contracting Officer determines that the reference price consistently and substantially failed to reflect market conditions—

31

the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described hereunder. The contract shall be modified to reflect such substitute effective on the date the indicator was discontinued, altered, or began to consistently and substantially fail to reflect market conditions. If the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the Disputes paragraph of the CONTRACT    TERMS    AND    CONDITIONS    – COMMERCIAL ITEMS clause of this contract.

99.    **(a)**  Neither (i) averages nor (ii) historical prices (i.e., before March 24, 2020[9]) is an element for consideration under the Contract's EPA Clause, ¶ (g)(4).  **(b)** Pursuant to EPA Clause, ¶ (g)(4), the contracting officer must determine whether, during performance [and not historical prices prior to award], the PLATTS market price that changes each month [and not its average over a period] "began" to consistently and substantially fail to reflect market conditions. **(c)**  The market conditions under the Contract's EPA clause, ¶ (g)(4) are those of Iraq's OPDC.  **(d)**  Also, when PLATTS "began" to fail cannot be, by definition, an "average" of PLATTS, nor (ii) based on historical PLATTS prices.  **(e)**  And, an average of all prices during the claim period will never determine the issue of "consistently" as required  by EPA Clause, ¶ (g)(4).

100.    **(a)**  The contracting officer did not faithfully perform his contractual duty of determining whether PLATTS "consistently and substantially fails to reflect market conditions" by impermissibly inserting words in EPA Clause, ¶ (g)(4).  **(b)**  See Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005), where the Federal Circuit states with regard to FAR 16.203:

"When there is no ambiguity in the meaning of the regulation, " 'it is the duty of the courts to enforce it

---

[9] On this date, DGCI informed DLA-E that it decided to not revise its original prices and that DLA-E could accept them without any changes.

> according to its obvious terms and not to insert words and
> phrases so as to incorporate therein a new and distinct
> provision.' " Gibson v. United States, 194 U.S. 182, 185, 24
> S.Ct. 613, 48 L.Ed. 926 (1904); *see also* United States v.
> Temple, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967
> (1881).

> The meaning of the regulations governing the use of EPA
> clauses is plain and we reject [an] . . . invitation to insert
> words into the regulation to alter that meaning.

101.    **(a)**  The grounds of the COFD's denial of DGCI's claim violate FAR

16.203-2(ii) and are inconsistent with and thus violate the terms of the Contract.  **(b)**  As

reflected by FAR 16.203-2(ii), a purpose of the EPA Clause is to eliminate the contingency

specified in the contract from offers that would otherwise be included due to projected long

term market instability, and to cover them separately under the EPA Clause.  **(c)**  FAR

16.203-2 states:

> A fixed-price contract with economic price adjustment may
> be used when (i) there is serious doubt concerning the
> stability of market or labor conditions that will exist during
> an extended period of contract performance, and (ii)
> contingencies that would otherwise be included in the
> contract price can be identified and covered separately in the
> contract.

**(d)**  In MAPCO, Judge Bruggink explains:

> Without an EPA Clause, the contractor would be forced to
> submit a higher bid to include a contingency to cover any
> unexpected increases in its costs.  By using an EPA clause,
> the Government is assured of not having to pay that
> contingency.

27 Fed Cl. at 413.  **(e)**  See also, Craft Machine Works, Inc., ASBCA No. 35167, 90-2

BCA ¶ 23095, explaining:

> By use of an EPA clause in a fixed price contract, the
> Government seeks to attract more bidders and lower priced
> proposals, bereft of contingencies that would otherwise be

included in the offers, FAR 16.203–2(ii). By eliminating these monetary "cushions" or contingencies which may be handled differently by each bidder, the Government also achieves a uniformity of offer (the proverbial "level playing field") which facilitates evaluation and award. In the unlikely event that price levels decline over the original period of contract performance, the EPA clause also insures that any such benefit, which ordinarily would inure solely to the contractor, would be shared to some extent by the Government.

Id. at 115,967, n. 3.

102.    **(a)**    Here, the Contract is a fixed-price contract with economic price adjustment.  **(b)**  FAR 16.203-2(ii), this Court[10] and the Board[11] all recognize that use of an EPA clause eliminates the need for offerors to include a cushion in their pricing to account for this risk, which DLA-E suggests is required.  **(c)**  The risk of PLATTS being consistently and substantially less than OPDC prices is covered by the Contract's EPA Clause, ¶ (g)(4).  **(d)**  Where, as here, PLATTS is consistently and substantially less than OPDC, then ¶ (g)(4) entitles DGCI to the difference between OPDC prices and the failed PLATTS prices that had been previously paid to DGCI.

103.    **(a)**    The contracting officer did not faithfully perform his contractual duty of determining whether PLATTS consistently and substantially failed to reflect market conditions by impermissibly reading out of the Contract the EPA Clause, ¶ (g)(4).  **(b)**  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to

---

[10] See Mapco, 27 Fed. Cl. at 413.

[11] See Craft Machine Works, Inc., ASBCA No. 35167, 90-2 BCA ¶ 23095 at 115,967, n. 3.

emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

104.    **(a)**  The ground upon which the COFD denied DGCI's claim – failure to include in DGCI's offer a contingency amount based on a prediction of OPDC prices -- runs contrary to FAR 16.203-1(a).  It also runs contrary to the reason for the inclusion of the EPA Clause in the Contract.  FAR 16.302-2(i), explains:

> A fixed-price contract with economic rice adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance . . . .

**(b)**  The presence of (and the contracting officer's decision to include) the EPA Clause in the solicitation informed offerors that the contracting officer had serious doubt of the stability of market conditions that will exist during performance – market changes were seriously unpredictable.  **(c)**  Also, for this reason, the EPA clause selected by the contracting officer went so far as to allow for revision the Contract's PLATTS reference price.

105.    **(A)**  **<u>In the COFD (p. 3)</u>**, the contracting officer denied DGCI's claim on the following ground:

> The margin is constant for the duration of the contract and should include all the vendor's cost (i.e., fuel, storage), overhead (i.e., lease, utilities), and profit.  The level of risk should also be factored in each element of the vendor's margin [<u>in formulating its offer</u>].

(emphasis added).  **(B)**  In similar vein, **<u>in the COFD (p. 9)</u>**, the contracting officer denied DGCI's claim on the following ground:

In addition, prior to the award of this contract, SPE605-20-D-9518, DGCI could have revised its prices multiple times, including when asked to re-validate pricing after Strategic and Varec's contracts were terminated.

**(C)**  Similarly, **in the COFD (pp. 2-3)**, the contracting officer denied DGCI's claim on the ground that DGCI had four opportunities to revise its pricing.  DLA-E claims that instead of adding March 2019 OPDC/PLATTS price difference of $0.389588 to its unit price, DGCI should have added either:  (a) the September 2019 OPDC/PLATTS price difference of $0.5049;  or (b) the October 16/27, 2019 OPDC/PLATTS price difference of $0.5422.

106.   **(a)**  The COFD's grounds for denial violate the procurement principle that a contracting officer may not second guess a bidder's business judgment on how it will formulate its price amount nor require an offeror to change its price.  **(b)**  See Southwest Truck Body Company, B-208660, September 8, 1982, 82-2 CPD ¶ 212 at 3 ("[H]ow a bidder arrives at its bid price is a matter of business judgment which is not subject to question by the contracting officer.")   **(c)**  See also, FAR 15.307(b) (contracting officer may "give[] an opportunity to submit a final proposal revision" and not require an offeror to change its price.)

107.   **(A)  In the COFD (p. 4)**, the contracting officer denied DGCI's claim on the  following grounds, relying on a method of analysis that differs from the one required by ¶ (g)(4).  The contracting officer calculated the average of the difference between OPDC and PLATTS monthly prices during the claim period to allegedly be approximately $.72, finding that "[on average] OPDC prices were approximately $0.72 higher than the [monthly] PLATTS prices for the [claim] period of November 2021 through October 2023."  **(B)  In the COFD (p. 10)**, the contracting officer refers to the claim period as "Period 4", alleges the precise average difference is $0.718074 and states this "was not

36

substantially higher than $0.625804[12] . . . [-- the average of the difference between the monthly OPDC and PLATTS prices --] for a 12-month period  [of February 8, 2018 through February 6, 2019, i.e., the period] prior to the solicitation's base reference date [of March 2019, referred to as Period 1]."  Based on the foregoing, the difference in the pricing amounts to $0.09227 ($0.718074 <u>LESS</u> $0.625804) which the contracting officer considers to be "not substantial[]."  That is, according to the contracting officer, $0.625804    is "similar" to $0.718074."  COFD at 10.  **(C)**  Similarly, **<u>in the COFD (p. 7)</u>**, the contracting officer states:

> For the initial period of the contract from May 2020 until November 2021, the difference between OPDC and PLATTS historical averages at $0.389144 and for Period 4, the months DGCI alleges the index failed, it was slightly higher than average at $0.718074. However, the average difference between PLATTS and OPDC for the entire length of the contract was $0.577104, which is consistent with the period prior to the solicitation base reference date and the period until contract award. Accordingly, although the difference changed over time, it stayed within the historical average.

108.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

108.1.  **(a)**  The grounds of the COFD's denial of DGCI's claim are inconsistent with and thus violate the terms of the Contract's EPA Clause.  **(b)** Neither averages nor (ii)

---

[12] DLA-E is comparing <u>apples-to-oranges</u> by comparing the historical prices to those under the current Contract.  The price history for the jet fuel purchased under DGCI's previous contract is for fuel that OPDC delivered to and DGCI picked up at Bagdad International Airport of which DGCI then transported to the contract's required destination.   The price for this jet fuel includes an additional fee because OPDC delivered it directly to the airport.  The fuel purchased by DGCI that is the subject of the claim does not include a delivery fee given that DGCI picked up the fuel directly from the Basra Refinery.

historical prices (i.e., before March 24, 2020[13]) is an element for consideration under the Contract's EPA Clause, ¶ (g)(4).   **(c)**   Pursuant to EPA Clause, ¶ (g)(4), the contracting officer must determine whether, during performance [and not historical prices prior to award], the PLATTS market price that changes each month [and not its average over a period] "began" to consistently and substantially fail to reflect market conditions. **(d)** The market conditions under the Contract's EPA clause, ¶ (g)(4) are those of Iraq's OPDC.  **(e)** Also, when PLATTS "began" to fail cannot be, by definition: (i) an "average" of PLATTS, nor (ii) historical PLATTS prices for the 27 month period analyzed in the COFD.  And, an average of all prices during the claim period will never determine the issue of "consistently" as required  by EPA Clause, ¶ (g)(4).

109.    EPA Clause ¶ (g)(4)'s requires the following method of analysis:   to determine whether revision of the escalator is required, compare the monthly PLATTS price with the monthly OPDC price during performance and if the PLATTS prices are consistently and substantially less than the OPDC prices, DGCI is entitled to the difference effective when PLATTS first began to be consistently and substantially less than OPDC prices.

110.    DLA-E eviscerated ¶(g)(4)'s method, and applied the following materially different method:

i.    <u>Step 1:</u>  Compute the differences between OPDC and PLATTS monthly prices during the claim period;

---

[13] On this date, DGCI informed DLA-E that it would not revise its original prices and that DLA-E could accept them without any changes.

ii.     Instead of determining whether the differences between OPDC and PLATTS monthly prices, each month during the claim period, are consistent and substantial as required by the ¶ (g)(4), DLA-E proceeded with the following materially different method:

iii.     <u>Step 2:</u>   Determine the average of the figures computed at Step 1 by computing the total of the OPDC/PLATTS monthly price differences during the period and dividing by the total number of months of the applicable period.

iv.     <u>Step 3:</u>   Repeat step 1 for historical prices.

v.     <u>Step 4:</u>   Repeat step 2 for historical prices.

vi.     <u>Step 5:</u>   Compare the average OPDC/PLATTS Difference during the claim period (step 2) with the Average Historical OPDC/PLATTS difference (step 4) to determine if the average OPDC/PLATTS price difference is higher, lower than or similar to the average historical OPDC/PLATTS price difference.

111.    **(a)**  The contracting officer did not faithfully perform his contractual duty of determining whether PLATTS is consistently and substantially less than OPDC by reading out of the Contract, EPA Clause, ¶(g)(4)'s method of analysis and denying DGCI's claim based on a materially different method.   **(b)**  DLA-E's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ." <u>Firestone Tire & Rubber Co. v. United States</u>, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971). See <u>Mayvin, Inc. v. United States</u>, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, <u>*United States v. Menasche*</u>, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting

*Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431

(1883))).  See <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339, 1347 (Fed. Cir. 2005),

where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the
> regulation, " 'it is the duty of the courts to enforce it
> according to its obvious terms and not to insert words and
> phrases so as to incorporate therein a new and distinct
> provision.' " <u>Gibson v. United States</u>, 194 U.S. 182, 185, 24
> S.Ct. 613, 48 L.Ed. 926 (1904); *see also* <u>United States v.
> Temple</u>, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967
> (1881).
>
> The meaning of the regulations governing the use of EPA
> clauses is plain and we reject [an] . . . invitation to insert
> words into the regulation to alter that meaning.

See also, <u>Ingham Reg. Med. Center v. United States</u>, 163 Fed. Cl. 384, 400 (2022) ("The

court may not change the plain meaning of the letter by adding language.").  See also,

<u>Mellon Bank, N.A. v. United States</u>, 47 Fed. Cl. 186, 191 (2000) (a "proposed

interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for

adding words and concepts that unambiguously are not included in the statutory wording,

. . . ."); <u>George Hyman Const. Co. v. United States</u>, 832 F.2d 574, 581 (Fed. Cir. 1987)

("If we accepted this argument, we would have to rewrite the contract, and words the

parties never agreed to, which we do not have the authority to do.")

     112.  **I<u>n the COFD (p. 8)</u>**, the contracting officer denied DGCI's claim on the

following ground:

> PLATTS' Arab Gulf March 2019 Reference Price Indicator
> was approved for use on this contract, and when [the
> PLATTS reference price of $1.805952 for March 2019 is]
> compared to the average [OPDC/PLATTS] price difference
> over the entire contract [period of performance allegedly to
> be $0.577104 as reflected on page 7], the [PLATTS
> reference] indicator [of $1.805952 for March 2019 as shown

> on page 5] successfully reflected how the fuel prices fluctuated over the entire period of performance of the contract [which is an average OPDC/PLATTS price difference of $0.577104 as stated on COFD p. 7].

(emphasis added).

113.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, Williams Alaska Petroleum, Inc. v. U.S., 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

113.1.  **(a)**  The grounds of the COFD's denial of DGCI's claim are inconsistent with and thus violate the terms of the Contract's EPA Clause.  **(b)**  Neither (i) averages nor (ii) historical prices is an element for consideration under the Contract's EPA Clause, ¶ (g)(4).  **(c)**  Pursuant to EPA Clause, ¶ (g)(4), the contracting officer must determine whether, during performance [and not historical prices prior to award], the PLATTS market price that changes each month [and not its average over a period] "began" to consistently and substantially fail to reflect market conditions.  **(d)**  Also, when PLATTS "began" to fail cannot be, by definition: (i) an average of PLATTS, nor (ii) based on historical PLATTS prices.  **(e)**  And, an average of all prices during the claim period will never determine the issue of "consistently" as required  by EPA Clause, ¶ (g)(4).

114.    **(a)**  EPA Clause ¶ (g)(4)'s requires the following method of analysis: compare the monthly PLATTS price with the monthly OPDC price during performance and if the PLATTS prices are consistently and substantially less than the OPDC prices, DLA-E is liable to DGCI for the difference effective when PLATTS first began to be consistently and substantially less than OPDC prices.

115.    DLA-E eviscerated ¶(g)(4)'s method, and applied the following materially different method:

i.     <u>Step 1:</u>   Compute the differences between OPDC and PLATTS monthly prices during the claim period;

ii.     Instead of determining whether the differences between OPDC and PLATTS monthly prices, each month during the claim period, are consistent and substantial as required by the ¶ (g)(4), DLA-E proceeded with the following materially different method:

iii.     <u>Step 2:</u>   Determine the average of the figures computed at Step 1 by computing the total of the OPDC/PLATTS monthly price differences during the period and dividing by the total number of months of the applicable period.

iv.     <u>Step 3:</u>   Compute the OPDC/PLATTS price difference for March 5, 2019.

vi.     <u>Step 4:</u>   Compare the Average OPDC/PLATTS Difference (step 2) with the OPDC/PLATTS difference for March 2019 (step 3) to determine if the Average OPDC/PLATTS price difference  "successfully reflected how the fuel prices fluctuated over the entire period of performance of the contract [which is an average OPDC/PLATTS price difference of $0.577104 as stated on COFD p. 7]."

115.1  **(a)**  The contracting officer did not faithfully perform his contractual duty of determining whether PLATTS is consistently and substantially less than OPDC by reading out of the Contract, EPA Clause, ¶(g)(4)'s method of analysis and denying DGCI's claim based on a materially different method.   **(b)**  DLA-E's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ." <u>Firestone Tire & Rubber Co. v. United States</u>, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971).  See <u>Mayvin, Inc. v. United States</u>, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, <u>*United States v.*</u>

_Menasche_, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to

give effect, if possible, to every clause and word of a statute,' rather than to emasculate an

entire section, as the Government's interpretation requires." (citation omitted) (quoting

Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431

(1883))).  See Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005),

where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the
> regulation, " 'it is the duty of the courts to enforce it
> according to its obvious terms and not to insert words and
> phrases so as to incorporate therein a new and distinct
> provision.' " Gibson v. United States, 194 U.S. 182, 185, 24
> S.Ct. 613, 48 L.Ed. 926 (1904); _see also_ United States v.
> Temple, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967
> (1881).
>
> The meaning of the regulations governing the use of EPA
> clauses is plain and we reject [an] . . . invitation to insert
> words into the regulation to alter that meaning.

See also, Ingham Reg. Med. Center v. United States, 163 Fed. Cl. 384, 400 (2022) ("The

court may not change the plain meaning of the letter by adding language.").  See also,

Mellon Bank, N.A. v. United States, 47 Fed. Cl. 186, 191 (2000) (a "proposed

interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for

adding words and concepts that unambiguously are not included in the statutory wording,

. . . ."); George Hyman Const. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987)

("If we accepted this argument, we would have to rewrite the contract, and words the

parties never agreed to, which we do not have the authority to do.")

116.  **(A) <u>In the COFD (p. 4)</u>**, the contracting officer denied DGCI's claim on

the following ground:

By failing to request the use of an alternate escalator or challenge the use of the PLATTS indicator during the solicitation and evaluation process, DGCI assumed the risk associated with PLATTS, which it knew was lower than OPDC pricing.

**(B)** Similarly, **in the COFD (p. 9)**, the contracting officer denied DGCI's claim on the following ground:

DGCI had the opportunity to request an exception to the PLATTS indicator in its response to the solicitation but chose not to.

\* \* \*

DGCI could have also protested the solicitation to argue that the PLATTS index was improper, but did not do so. In addition, prior to the award of this contract, SPE605-20-D-9518, DGCI could have revised its prices multiple times, including when asked to re-validate pricing after Strategic and Varec's contracts were terminated.

117.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, Williams Alaska Petroleum, Inc. v. U.S., 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

117.1  **(a)**  The basis of the COFD's denial of DGCI's claim is inconsistent with and thus violates the terms of the solicitation's EPA Clause.  **(b)**  The solicitation's EPA Clause is not discretional as suggested by DLA-E.  **(c)**  It is a "mandatory contract provision that significantly affects the legal rights of the government and the legal obligations of the contractor."  American Engineered Solutions, B-289051, December 20, 2001, 2001 CPD ¶ 207 at 4.  **(d)**  Had DGCI taken exception to the EPA Clause, DLA-E could have rejected its proposal submission.  **(e)** See Pleasey Electronic Systems Corp., B-236494, September 11, 1989, 89-2 CPD ¶ 226 at 2 ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of a solicitation should be considered

unacceptable and may not form the basis for an award.")  See also, <u>Advanced Management Strategies Group, Inc.</u>, B-423290, B-42390.2, April 16, 2025, 2025 CPD ¶ 80 at 7 ("A proposal or quotation that takes exception to a solicitation's material terms and conditions should be considered unacceptable and may not form the basis for an award.")

118.  **(a)** The COFD's denial of DGCI's claim that is based on whether or not DGCI had an opportunity to file a protest challenging PLATTS, has no legal effect on DGCI's contractual rights under the Contract's EPA Clause.  **(b)**  A solicitation protest challenges the legality of the PLATTS index (e.g. whether PLATTS represents the correct product, etc.) and the remedy being the replacement of PLATTS with a substitute effective at the time of proposal preparation.  **(c)**  A solicitation protest differs from DGCI's post-award claim for economic price adjustment under EPA Clause, ¶ (g)(4).  DGCI's claim is that pursuant to EPA Clause, ¶ (g)(4), because PLATTS is consistently and substantially less than OPDC during the claim period, DGCI is entitled to the difference, effective from when PLATTS first began to fail.  The Contract's EPA Clause, ¶ (g)(4), dictates that the claim be resolved by and through the Disputes Clause.  **(d)**  Significantly, whether PLATTS will be consistently and substantially less than OPDC during a period after award is obviously unknown at the time a pre-award solicitation protest is filed.

119.  Offerors prepared price proposals based on the terms of the solicitation and with the understanding that:  (i) the contract to be awarded will be a firm-fixed-price contract that will include the terms of the Economic Price Adjustment Clause that is contained in the solicitation; (ii) the terms of EPA Clause, ¶ (g)(4), require that where, <u>after award</u>, PLATTS is determined to consistently and substantially fail to reflect market conditions, the Contract will be modified, to replace PLATTS with an appropriate and

comparable substitute, which, in the current action, is OPDC; and (iii) where, as here, PLATTS is consistently and substantially less than OPDC, then ¶ (g)(4) entitles the awardee to the difference between OPDC and the failed PLATTS price, effective when PLATTS began to fail.

119.1.  **(a)**  DLA-E's denial on the ground that because DGCI did not challenge the legality of PLATTS, DGCI assumed the risk, under EPA Clause, ¶ (g)(4), when PLATTS consistently and substantially fails to reflect the market conditions (OPDC), reads out of the Contract, EPA Clause, ¶ (g)(4).  **(b)** The basis of the COFD's denial of DGCI's claim violates the terms of the Contract by reading out of the Contract EPA Clause, ¶ (g)(4).  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed. Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))). **(c)**  Said differently, DLA-E's position requires inserting language in EPA Clause, ¶ (g)(4) to the effect that unless DGCI challenges the legality of PLATTS, DGCI assumes the risk, under EPA Clause, ¶ (g)(4), when PLATTS consistently and substantially fails to reflect the market conditions.  **(d)**  The basis of the COFD's denial of DGCI's claim violates the terms of the Contract's EPA Clause by inserting words into the Contract's EPA Clause, ¶ (g)(4).  Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971) ("unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . .")  See also, Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005), where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the regulation, " 'it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.' " Gibson v. United States, 194 U.S. 182, 185, 24 S.Ct. 613, 48 L.Ed. 926 (1904); *see also* United States v. Temple, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967 (1881).

> The meaning of the regulations governing the use of EPA clauses is plain and we reject [an] . . . invitation to insert words into the regulation to alter that meaning.

See also, Ingham Reg. Med. Center v. United States, 163 Fed. Cl. 384, 400 (2022) ("The court may not change the plain meaning of the letter by adding language.").  See also, Mellon Bank, N.A. v. United States, 47 Fed. Cl. 186, 191 (2000) (a "proposed interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for adding words and concepts that unambiguously are not included in the statutory wording, . . . ."); George Hyman Const. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987) ("If we accepted this argument, we would have to rewrite the contract, and words the parties never agreed to, which we do not have the authority to do.")

120.    The contracting officer's denial on the basis that DGCI should have filed a solicitation protest challenging the legality of PLATTS, impermissibly removes the EPA Clause from the Contract.  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

121.    **In the COFD (p. 6)**, the contracting officer denied DGCI's claim on the following basis:

> DLA Energy acknowledges that the difference between the PLATTS indicator and the OPDC price <u>varied</u> during the contract, but these values are expected to vary.  The tables above show how the average, the minimum and the maximum price difference varied over time.  Although there were some changes, these changes are not significant or consistent . . . .

(emphasis added).

122.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

122.1.  **(a)**  The basis of the denial is inconsistent with and thus violates the terms of the Contract's EPA Clause, ¶ (g))(4) which imposes on the contracting officer the responsibility to determine whether each and every PLATTS monthly price "consistently and substantially fails to reflect market conditions."  The contracting officer eviscerated EPA Clause, ¶ (g)(4)'s method, applying a materially different method of analysis-- "whether the average, the minimum, and maximum price difference varied over time."

123.    **(a)**  EPA Clause ¶ (g)(4)'s requires the following method of analysis: compare the monthly PLATTS price with the monthly OPDC price during performance and if the PLATTS prices are consistently and substantially less than the OPDC prices, DGCI is entitled to the difference effective when PLATTS first began to be consistently and substantially less than OPDC prices.  **(b)**  A review of the OPDC/PLATTS monthly price differences begins immediately after award with the first batch of jet fuel purchased in May 2020 as shown in the <u>Table above</u>.  It is not until months later in November 2021

or January 2022 (having an OPDC/Price difference of $0.444999 or $0.420020, respectively) when, for the first time, the OPDC/PLATTS monthly price difference began to be consistent, with all subsequent months through October 2023 the OPDC/PLATTS price difference being greater than November 2021 or January 2022's price difference. **(b)** The magnitude of the monthly differences during the claim period is <u>substantial</u>.  **(c)** DLA-E considers the magnitude of $0.1982085 and $0.076422 for jet fuel substantial and each is less than $$0.444999 or 0.420020.

124.    The contracting officer did not faithfully perform his contractual duty of determining whether each PLATTS price "consistently and substantially fails to reflect market conditions," and when this first "began" for determining the monthly adjustment, effective when the PLATTS price first "began" to consistently and substantially fail to reflect market conditions.

125.    **(a)**  The contracting officer did not faithfully perform his contractual duty of determining whether PLATTS is consistently and substantially less than OPDC by reading out of the Contract, EPA Clause, ¶(g)(4)'s method of analysis and denying DGCI's claim based on a materially different method of analysis.   **(b)**  DLA-E's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ." <u>Firestone Tire & Rubber Co. v. United States</u>, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971). See <u>Mayvin, Inc. v. United States</u>, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, <u>*United States v. Menasche*</u>, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting <u>Inhabitants of Montclair Tp. v. Ramsdell</u>, 107 U.S. 147, 152, 2 S.Ct.

391, 27 L.Ed. 431 (1883))).  See <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339,

1347 (Fed. Cir. 2005), where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the
> regulation, " 'it is the duty of the courts to enforce it
> according to its obvious terms and not to insert words and
> phrases so as to incorporate therein a new and distinct
> provision.' " <u>Gibson v. United States</u>, 194 U.S. 182, 185, 24
> S.Ct. 613, 48 L.Ed. 926 (1904); *see also* <u>United States v.
> Temple</u>, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967
> (1881).
>
> The meaning of the regulations governing the use of EPA
> clauses is plain and we reject [an] . . . invitation to insert
> words into the regulation to alter that meaning.

See also, <u>Ingham Reg. Med. Center v. United States</u>, 163 Fed. Cl. 384, 400 (2022) ("The

court may not change the plain meaning of the letter by adding language.").  See also,

<u>Mellon Bank, N.A. v. United States</u>, 47 Fed. Cl. 186, 191 (2000) (a "proposed

interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for

adding words and concepts that unambiguously are not included in the statutory wording,

. . . ."); <u>George Hyman Const. Co. v. United States</u>, 832 F.2d 574, 581 (Fed. Cir. 1987)

("If we accepted this argument, we would have to rewrite the contract, and words the

parties never agreed to, which we do not have the authority to do.")

126.    **In the COFD (p. 6)**, the contracting officer denied DGCI's claim, stating

that ". . . DGCI's bid price should have compensated for the[] changes [in the price

difference between OPDC and PLATTS during the claim period] because DGCI was aware

of the historical variation."

127.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its

own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800

(2003), quoting DESC's Memorandum of May 12, 1995.

127.1.  **(a)**  The COFD's denial is predicated on impermissibly reading out of the Contract, EPA Clause, ¶ (g)(4).  **(b)**  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

128.  **(a)**  The COFD's denial is inconsistent with and thus violates the terms of the Contract's EPA Clause.   **(b)**  As reflected by FAR 16.203-2, a purpose of the EPA Clause is to eliminate the contingency specified in the contract from offers that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA Clause.  **(c)**  See, FAR 16.203-2, stating:

> A fixed-price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract.

**(c)** In MAPCO, Judge Bruggink explains that where a solicitation includes an EPA Clause, because occurrence of the contingency is covered by the EPA Clause offerors are not forced to include an amount to cover the contingency in their offers:

> Without an EPA Clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs.  By using an EPA clause, the Government is assured of not having to pay that contingency.

27 Fed Cl. at 413.  **(d)**  See also, Craft Machine Works, Inc., *supra*, at 115,969, stating

> [T]he very purpose of the EPA clause, as stated in the
> regulations, is to eliminate contingencies from a bid that
> would otherwise be included due to projected long term
> market instability, and to cover them separately under the
> EPA clause, FAR 16.203–2.

129.    **(a)**    Here, the Contract is a fixed-price contract with economic price adjustment.  Under the Contract's EPA Clause, ¶ (g)(4), where the contingency occurs – the PLATTS reference price consistently and substantially fails to reflect market conditions – then by mutual agreement, a new reference price will be substituted for PLATTS for determining the price adjustment, effective on the date the contingency began, entitling DGCI to the difference between OPDC and the failed PLATTS price.  **(b)**  Where, as here, PLATTS is consistently and substantially less than OPDC, then ¶ (g)(4) entitles DGCI to an upward adjustment, i.e., the difference between OPDC and the failed PLATTS price that had been previously paid to DGCI.   **(c)**   EPA Clause, ¶ (g)(4) renders it unnecessary for offerors to submit a higher offer to cover such a contingency.

130.    **In the COFD (p. 7)**, the contracting officer denied DGCI's claim, indicating that DLA-E does not agree to use OPDC as the substitute for PLATTS because at the time DLA-E prepared the solicitation PLATTS was a means that could "predict" fluctuation in fuel prices, rendering it unnecessary to use "supplier notice" [14]:

> The use of supplier notice for economic price adjustment on
> a contract is only necessary when the means used to predict
> fluctuation in fuel prices cannot be done using a fuel price
> publication like PLATTS.  However, [i]n this [solicitation] .

---

[14] EPA Clause, ¶ (c)(3), states, in relevant part:  "For price adjustment utilizing commercial publications such as Platts Oilgram, etc., the reference price in effect on the date of delivery shall be that items reference price that is in effect for the dates in the Table below."  EPA Clause ¶ (c)(4) (supplier notice) states:  For price adjustments utilizing a reference price indicator other than commercial publications such as Platts Oilgram, the Contractor shall notify the Contracting Officer of any changes in the reference price in writing within 15 calendar days from the date thereof."

> . . both the government and vendors [i.e., all offerors] agreed
> to the method of how the fuel prices would escalate.

131.    The contracting officer did not faithfully perform his contractual duty to reasonably determine whether to agree with DGCI to substitute PLATTS with OPDC.

132.    **(a)** The COFD's basis for denial is inconsistent with and thus violates the terms of the solicitation and Contract and renders EPA Clause, ¶ g(4), meaningless.  **(b)** The ground for denial fails to read the solicitation as a whole, in a manner that gives meaning to all its parts.  See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (interpretation "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.")  **(c)** As indicated by the COFD, the solicitation did advise offerors that under EPA Clause, ¶ (c), the reference price is PLATTS and that the award price would be adjusted based on PLATTS to determine the price payable.  **(d)** *Additionally*, however, in drafting the solicitation, DLA-E included EPA Clause, ¶ (g)(4), the terms of which DLA-E and all offerors agreed would be included in the contract.  **(e)** EPA Clause, ¶ (g)(4), states that where the contracting officer determines that the reference price, PLATTS, "consistently and substantially fails to reflect market conditions," the Contract must be modified to replace PLATTS with an appropriate and comparable substitute (which in the instant action, is OPDC) for determining the price adjustment, effective on the date the reference price indicator began to consistently and substantially fail to reflect market conditions.

133.    **(a)** DLA-E recognizes that prices established by a Government body may be used as an escalator (i.e., reference price under the Contract) under an EPA Clause.  **(b)**

The Oil Products Distribution Center ("OPDC") is part of Iraq's Ministry of Oil ("MoO"). DLAD 5416.203-4 (S-90) specifically permits the use of Iraq's OPDC as a reference price.

134.    **In the COFD (p. 7)**, the contracting officer denied DGCI's claim on the following ground:

> All offerors, to include DGCI, agreed to assume the risk associated with the price variance between OPDC pricing and the PLATTS indicator, when they submitted an offer without requesting a change in the escalator. DGCI was aware of the price difference between OPDC and PLATTS and was aware that fuel had to be purchased through OPDC, which has control over prices. However, DGCI chose not to object to the terms of the solicitation during the procurement process. Rather, it used its knowledge about the OPDC pricing and process and factored that into its offer as other offerors likely did.

135.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, Williams Alaska Petroleum, Inc. v. U.S., 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

135.1.  **(a)**  The basis of the COFD's denial of DGCI's claim is inconsistent with and thus violates the terms of the solicitation and Contract.  **(b)**  Denial is predicated on impermissibly reading out of the Contract the EPA Clause.  **(c)**  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

136.    **(a)**    Here, the Contract is a fixed-price contract with economic price adjustment.  **(b)** None of the offerors agreed to assume the risk that the PLATTS monthly

prices would consistently and substantially fail to reflect market conditions.  **(c)**  This is the contingency covered by the solicitation's EPA Clause, ¶ (g)(4), which requires that where the contingency occurs, then by mutual agreement, a new reference price must be substituted for PLATTS for determining the price adjustment, effective on the date the contingency began.  **(d)**  Where, as here, PLATTS is consistently and substantially less than OPDC, then ¶ (g)(4) entitles DGCI to an upward adjustment, i.e., the difference between OPDC and the PLATTS monthly prices.  **(e)**  EPA Clause, ¶ (g)(4) eliminates the need for offerors to submit a higher offer to cover such a contingency.

137.    **In the COFD (p. 7)**, the contracting officer denied DGCI's claim on the following ground:

> [C]hanging the escalator and how the fuel price escalates
> now, violates the procurement integrity of the acquisition
> process, because all offerors were not allowed to submit
> their bid price with the understanding that the prices would
> escalate using actual OPDC pricing versus the PLATTS
> indicator.

138.    **(a)**  The above ground for denial reflects that the contracting officer is unwilling to substitute OPDC for PLATTS, explaining that offerors agreed to and did not challenge the terms of the solicitation, including that the reference price is PLATTS upon which offerors prepared their price and did not request that it be changed to OPDC.  **(b)** According to the contracting officer, revising the escalator, PLATTS, after award, would result in terms that differ from those under the competitively issued solicitation that had informed offerors that PLATTS is the reference price with which the price payable is to fluctuate under EPA Clause, ¶ (c), and not OPDC, and thus would "violate the procurement integrity of the acquisition process."

139.    The contracting officer did not faithfully perform his contractual duty of reasonably determining whether to agree with DGCI to substitute PLATTS with OPDC.

140.    **(a)**    The logical extension of the COFD's basis for denial is that any substitute  (not just OPDC) that is used to replace the PLATTS reference price after award would be deemed to "violate the procurement integrity of the acquisition process" because offerors did not formulate their prices based on the substitute escalator.  **(b)**  The COFD's basis for denial renders meaningless, useless and  ineffective the Contract's EPA Clause, ¶(g)(4).  **(c)**  "[A] court should reject any interpretation which would render portions of the contract meaningless, useless, ineffective, or superfluous."  Boehm v. United States, 22 Cl.Ct. 511, 516 (Cl.Ct.,1991), citing, United Pac. Ins. Co. v. United States, 497 F.2d 1402, 1405, 204 Ct.Cl. 636 (1974); Restatement (Second) of Contracts § 203(a) (1981). See also, Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1201 (Fed. Cir. 2006) (finding "[b]ecause the government's interpretation would render that portion of the Contract meaningless and superfluous, it is not reasonable. [The contractor's] . . . interpretation, on the other hand, preserves the meaning of each provision of the Contract and is therefore the only reasonable interpretation proposed by the parties.")

141.    **(a)**  The basis upon which the COFD denied DGCI's claim is inconsistent with and thus violates the terms of the solicitation.  **(b)**  Substituting OPDC for PLATTS after award in accordance with EPA Clause, ¶ (g)(4), does not change the terms of the solicitation.  **(c)**  Offerors prepared price proposals based on the terms of the solicitation and with the understanding that, according to the solicitation: (i) the reference price for CLIN 0006 is PLATTS; (ii) the contract to be awarded will be a firm-fixed-price contract that will include the terms of Economic Price Adjustment Clause that are contained in the

solicitation;  (iii) under EPA Clause ¶ (c), the price payable would fluctuate based on PLATTS to the extent PLATTS increased or decreased; and  (iv) under EPA Clause, ¶ (g)(4), where, after award, beginning when the contingency is met – PLATTS monthly prices is determined to consistently and substantially fail to reflect market conditions – the Contract will be modified, to replace PLATTS with an appropriate and comparable substitute which, in the current action, is OPDC.  **(d)**  Where, as here, PLATTS is consistently and substantially less than OPDC, then EPA Clause ¶ (g)(4) entitles the awardee to an upward adjustment, i.e., the difference between OPDC and PLATTS monthly prices.  Thus, the integrity of the award process cannot be undermined.

142.    **In the COFD (p. 7-8)**, the contracting officer denied DGCI's claim on the basis that DGCI should have

> request[ed] the price adjustment at the time of the claimed failure.  DGCI's argument that there was no prejudice presumes that had DLA Energy determined the escalator had failed, DLA Energy would have necessarily continued with DGCI under an OPDC escalator.  As explained above, to ensure the integrity of the acquisition process, DLA energy might have terminated the contract and resolicited to give other offer[or]s the chance to bid on these fundamentally different terms, had it determined that the escalator failed.

> \* \* \*

> . . . DGCI should have requested the price adjustment when the index failed during contract performance and not approximately a year and a half after the alleged point of failure, near the end of the contract.  Failure to do so in a timely manner, negatively affected the Government.  DGCI's decision to continue performance during this period when the PLATTS indicator had allegedly failed, rather than request a price index change, constitutes acceptance of the fuel fluctuation under the PLATTS index.

143.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

143.1.  **(a)**  The basis upon which the COFD denied DGCI's claim is inconsistent with and thus violates the Contract's EPA Clause.  **(b)**  In drafting its Economic Price Adjustment Clause, DLA-E did not include (and thus the parties did not agree to) a time limitation for DGCI to request the contracting officer to change the reference price in accordance with ¶ (g)(4).  **(c)**  Thus, there can be no prejudice to DLA-E or acceptance of fuel fluctuation prices by DGCI.  **(d)**  The contracting officer's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ."  <u>Firestone Tire & Rubber Co. v. United States</u>, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971).  The contracting officer may not change the plain meaning of the DLA's EPA Clause by inserting words.  **(e)**  See <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339, 1347 (Fed. Cir. 2005), where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the regulation, " 'it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.' " <u>Gibson v. United States</u>, 194 U.S. 182, 185, 24 S.Ct. 613, 48 L.Ed. 926 (1904); *see also* <u>United States v. Temple</u>, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967 (1881).
>
> The meaning of the regulations governing the use of EPA clauses is plain and we reject [an] . . . invitation to insert words into the regulation to alter that meaning.

See also, <u>Ingham Reg. Med. Center v. United States</u>, 163 Fed. Cl. 384, 400 (2022) ("The court may not change the plain meaning of the letter by adding language.").  See also, <u>Mellon Bank, N.A. v. United States</u>, 47 Fed. Cl. 186, 191 (2000) ("Plaintiffs' proposed

interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for adding words and concepts that unambiguously are not included in the statutory wording, . . . ."); George Hyman Const. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987) ("If we accepted this argument, we would have to rewrite the contract, and words the parties never agreed to, which we do not have the authority to do.")

144. **(a)** A termination of DGCI's requirements Contract (as mentioned by DLA-E above), would only be for the illegal purpose of shopping for a lower price after award in order for DLA-E to escape its contractual obligation to compensate DGCI under the EPA Clause given that, as shown above, substituting OPDC for PLATTS after award in accordance with EPA Clause, ¶ (g)(4), does not change the terms of the solicitation or the expectation of the parties after contract award. **(b)** Thus, such a termination for convenience would not be in furtherance of the statutory requirements for full and open competition. **(c)** The termination plan disclosed by DLA-E reflects that it had entered into the Contract with DGCI with no intention of fulfilling its promise under EPA Clause, ¶ (g)(4), a breach of DLA-E's duty to deal with DGCI fairly and in good faith. **(d)** See e.g., Krygoski Const. Co., Inc. v. United States, 94 F.3d 1537, 1545 (Fed. Cir. 1996) (explaining that under Torncello, a termination for convenience is not recognized where the basis for the termination reflects that the Government "enter[ed] a contract with no intention of fulfilling its promises.") See also, Salsbury Industries v. United States, 905 F.2d 1518, 1512 (Fed. Cir. 1990 (explaining that Torncello "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause.")

145.    **In the COFD (p. 8)**, the contracting officer denied DGCI's claim on the basis that DLA-E will not agree to use OPDC as a substitute for PLATTS. explaining:

> The claim submitted by DGCI would change the scope of the contract because it would be a significant change from an escalator based on the PLATTS indictor, to a "supplier notification" method using the actual cost of the fuel. The "Supplier Notification" is a method that reduces the risk associated with fuel pricing when an index-based escalator cannot accurately reflect the changes in the cost of the fuel over time. However, the "Supplier Notification" method should be identified at the pre-award stage of the acquisition process, to ensure all offerors have the opportunity to submit a bid price with the understanding that a "Supplier Notification" method will be used to escalator fuel prices.

146.    DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, <u>Williams Alaska Petroleum, Inc. v. U.S.</u>, 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

146.1.  **(a)**   The basis for the denial is inconsistent with and thus violates the Contract's EPA Clause, ¶ (g)(4), which does not state that PLATTS cannot be substituted by OPDC (established price of the jet fuel).  **(b)**  To say otherwise, as does the contracting officer, requires impermissibly inserting words to this effect.  **(c)**  The contracting officer's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ."  <u>Firestone Tire & Rubber Co. v. United States</u>, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971). See <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339, 1347 (Fed. Cir. 2005), where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the regulation, " 'it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.' " <u>Gibson v. United States</u>, 194 U.S. 182, 185, 24 S.Ct. 613, 48 L.Ed. 926 (1904); *see also* <u>United States v.</u>

> Temple, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967 (1881).
>
> The meaning of the regulations governing the use of EPA clauses is plain and we reject [an] . . . invitation to insert words into the regulation to alter that meaning.

See also, Ingham Reg. Med. Center v. United States, 163 Fed. Cl. 384, 400 (2022) ("The court may not change the plain meaning of the letter by adding language."). See also, Mellon Bank, N.A. v. United States, 47 Fed. Cl. 186, 191 (2000) ("Plaintiffs' proposed interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for adding words and concepts that unambiguously are not included in the statutory wording, . . . ."); George Hyman Const. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987) ("If we accepted this argument, we would have to rewrite the contract, and words the parties never agreed to, which we do not have the authority to do.")

147.    **(a)** The basis for the denial is inconsistent with and thus violates the terms of the solicitation and Contract. The ground for denial fails to read the solicitation as a whole, in a manner that gives meaning to all its parts. See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (interpretation "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") **(b)** Substituting OPDC for PLATTS after award in accordance with ¶ (g)(4) does not affect the terms of the solicitation nor does it change the scope of the Contract. **(c)** At the time offerors prepared pricing, offerors understood that under the terms of the solicitation: (i) the base reference price for the jet fuel is PLATTS as of March 1, 2019 amounting to $1.805952 upon which offerors may formulate price proposals, (ii) within the scope of the awarded contract is EPA Clause, ¶ (g)(4); (iii) EPA Clause ¶ (g)(4)  does not prohibit any awardee from requesting the contracting officer to

make a determination as to whether PLATTS, during a specified period, consistently and substantially fails to reflect market conditions; and (iv) if it does, the PLATTS reference price must be substituted.  **(d)**  Any awardee must pay OPDC prices to acquire the fuel in Iraq.

148.    **(a)**  The contracting officer's ground for denial, that a substitute for the reference price under EPA Clause, ¶ (g)(4) "should be identified at the pre-award stage of the acquisition process" is based on reading out of the Contract, EPA Clause, ¶ (g)(4).  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).  **(b)**  Under EPA Clause ¶(g)(4), it is not until after award when, during a specific post-award period, that the PLATTS reference price can begin to consistently and substantially fail to reflect market conditions and the parties to the awarded contract mutually agree upon a substitute, and only then is a new or different reference price relevant or identified.

## CLAIMS FOR RELIEF

### COUNT I
### (DLA-E is Liable for DGCI's Claim Amount for Economic Price Adjustment)

149.    The facts set forth in paragraphs 1 through 90 are incorporated herein.

150.    FAR 16.203-1(a) states:

> A fixed-price contract with economic price adjustment
> provides for upward and downward revision of the stated

> contract price <u>upon the occurrence of specified contingencies</u>.

(emphasis added).  See also, in <u>Mapco Alaska Petroleum v. United States</u>, 27 Fed. Cl. 405 (1992), abrogated on other grounds by <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339, where Judge Bruggink explains that because occurrence of the contingency specified in the EPA Clause establishes Government liability, this obviates the need for offerors to include an amount to cover the contingency in their offers:

> Without an EPA Clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs.  By using an EPA clause, the Government is assured of not having to pay that contingency.

27 Fed Cl. at 413.

151.    The facts alleged herein demonstrate that the specified contingency of EPA Clause, ¶ (g)(4), occurred -- PLATTS is consistently and substantially less than OPDC -- making Defendant liable to Plaintiff for damages in the amount of $7,274,375.57 for economic price adjustment.  This quantum amount is the difference between OPDC (the appropriate and comparable substitute) and PLATTS, effective November 2021, when PLATTS began to be consistently and substantially less than OPDC, through October 2023.  See Complaint, ¶ 88.

151.1. Alternatively, the facts alleged herein demonstrate that the specified contingency of EPA Clause, ¶ (g)(4), occurred -- PLATTS is consistently and substantially less than OPDC -- making Defendant liable to Plaintiff for damages in the amount of $7,102,262.27 for economic price adjustment.  This quantum amount is the difference between OPDC (the appropriate and comparable substitute) and PLATTS, effective

January 2022, when PLATTS began to be consistently and substantially less than OPDC, through October 2023. See Complaint, ¶ 89.

152.    Based on the facts alleged herein, Plaintiff has satisfied the elements required for recovery of the economic price adjustment under EPA Clause, ¶ (g)(4). DGCI has proven liability and damages de novo. See Wilner, 24 F.3d at 1401.

153.    Accordingly, the Court should find that Defendant is liable to Plaintiff (and DGCI is legally entitled to recovery from Defendant) for the claim amount for economic price adjustment, plus interest, under the Contract Disputes Act.

### COUNT II
**(Breach of Contractual Duty to Reasonably Determine Whether PLATTS Consistently and Substantially Fails to Reflect Market Conditions)**

154.    The facts set forth in paragraphs 1-90, 91-129, 134-136, 142-144, 146 and 148 are incorporated herein.

155.    The contracting officer failed to perform (and unreasonably performed) his contractual duty of reasonably determining whether PLATTS "consistently and substantially fails to reflect market conditions" as required by the Contract's EPA Clause, ¶ (g)(4).

156.    Each and every ground for denial is a breach of the contracting officer's contractual duty to reasonably and faithfully determine whether PLATTS consistently and substantially fails to reflect market conditions as required by the Contract's EPA Clause, ¶ (g)(4).

157.    "Failure to perform a contractual duty when it is due is a breach of the contract." Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed.Cir.1995) (citing Restatement (Second) of Contracts § 235(2) (1981)), aff'd, 518 U.S. 839, 116 S.Ct. 2432,

135 L.Ed.2d 964 (1996). "Non-performance includes defective performance as well as an absence of performance." Westlands Water District v. United States, 109 Fed. Cl. 177, 193 (2013), quoting Restatement (Second) of Contracts § 235 cmt. b.

158.    There is a valid contract between the parties, the contracting officer is responsible for performing the above mentioned duty that arises out of the Contract, has failed to perform (which includes defectively performed) this duty, and pursuant to EPA Clause, ¶ (g)(4), had the contracting officer properly performed his contractual duty, DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count I.  See San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989) (elements for recovery of breach of contract).

159.    Accordingly, the Court should find DLA-E materially breached the Contract in failing to perform its contractual duty.

## COUNT III
**(Breach of Contractual Duty to Reasonably Determine Whether to Mutually Agree with DGCI to Substitute PLATTS with OPDC)**

160.    The facts set forth in paragraphs 1-90, 130-133, 137-141, 145 and 147 are incorporated herein.

161.    The contracting officer failed to perform (and defectively performed) his contractual duty of reasonably determining whether to mutually agree with DGCI to substitute PLATTS with OPDC as required by the Contract's EPA Clause, ¶ (g)(4).

162.    Each and every ground for denial is a breach of the contracting officer's contractual duty to reasonably and faithfully determine whether to mutually agree with DGCI that OPDC is the appropriate and comparable substitute for PLATTS as required by the Contract's EPA Clause, ¶ (g)(4).

163.    "Failure to perform a contractual duty when it is due is a breach of the contract." Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed.Cir.1995) (citing Restatement (Second) of Contracts § 235(2) (1981)), aff'd, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). "Non-performance includes defective performance as well as an absence of performance." Westlands Water District v. United States, 109 Fed. Cl. 177, 193 (2013), quoting Restatement (Second) of Contracts § 235 cmt. b.

164.    There is a valid contract between the parties, the contracting officer is responsible for performing the above mentioned duty that arises out of the Contract, has failed to perform (which includes defectively performed) this duty, and pursuant to EPA Clause, ¶ (g)(4), had the contracting officer properly performed his contractual duty, DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count I. See San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.1989) (elements for recovery of breach of contract).

165.    Accordingly, the Court should find DLA-E materially breached the Contract in failing to perform its contractual duty.

### COUNT IV
### (Violation of FAR 16.203-1 and 16.203-2)

166.    The facts set forth in paragraphs 1 through 90, 91-95, 96, 97, 101, 102, 104, 126-129, 130 and 132 are incorporated herein.

167.    The contracting officer's grounds for denial – that DGCI's offer should have included a cushion to cover the OPDC/PLATTS price difference in the event PLATTS is consistently and substantially less than OPDC because DGCI assumed the risk of the occurrence of this contingency -- violate FAR 16.203-1, which states:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies.

168.    The contracting officer's grounds for denial also violate FAR 16.203-2.  As reflected by FAR 16.203-2(ii), a purpose of the EPA Clause is to eliminate from the contract price contingencies that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA Clause.  **(c)**  See, FAR 16.203-2(ii), stating:

> A fixed-price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract.

In <u>MAPCO</u>, Judge Bruggink explains that where a solicitation includes an EPA Clause, because the risk of the occurrence of the contingency is covered by the EPA Clause offerors are not forced to include an amount to cover the contingency in their offers:

> Without an EPA Clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs.  By using an EPA clause, the Government is assured of not having to pay that contingency.

27 Fed Cl. at 413.  **(e)**  See also, <u>Craft Machine Works, Inc.</u>, ASBCA No. 35167, 90-2 BCA ¶ 23095, explaining:

> By use of an EPA clause in a fixed price contract, the Government seeks to attract more bidders and lower priced proposals, bereft of contingencies that would otherwise be included in the offers, FAR 16.203–2(ii). By eliminating these monetary "cushions" or contingencies which may be handled differently by each bidder, the Government also achieves a uniformity of offer (the proverbial "level playing

field") which facilitates evaluation and award. In the unlikely event that price levels decline over the original period of contract performance, the EPA clause also insures that any such benefit, which ordinarily would inure solely to the contractor, would be shared to some extent by the Government.

Id. at 115,967, n. 3.

169.    Judge Bruggink rejected a similar argument made by the Defense Fuel Supply Center[15] in Mapco Alaska Petroleum v. United States, 27 Fed. Cl. 405 (1992), abrogated on other grounds by Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, finding:

> Unaccountably, however, defendant contends that the real cause of MAPCO's losses was its failure to bid higher enough to cover unexpected deviations in the price escalator relative to its costs.  See Craft Mach. Works, Inc., ASBCA No. 35,167, 90-3 BCA ¶ 23,095; but see American Transparents Plastic Corp., 83-2 Comp. Gen. ¶ 539 (Nov. 8, 1983) [footnote omitted]

Id. at 413.  In footnote 12, the Court discussed Craft, supra, at 115,969, stating:

> In Craft, the Government argued a position similar to that which it now argues here.  The Board addressed the argument as follows:
>
> 'The Government recognizes that the economic relief offered by its clause is wanting from an overall inflation perspective, but argues that appellant has no reason to complain since the Government placed it on notice of this fact, and appellant failed to place "contingencies" in its bid to account for this less-than-comprehensive treatment. However, the Government ignores the fact that the very purpose of the EPA clause, as stated in the regulations, is to eliminate contingencies from a bid that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA clause, FAR 16.203–2. Indeed, under FAR 16.203–2(a), the contracting officer is tasked to insure that contingencies are not

---

[15] Defense Fuel Supply Center is the former name of DLA-Energy.

duplicated by the contractor by their inclusion "in both the base price and the adjustment requested...." This raises the serious question whether the Government's purported encouragement of contingencies is consistent with its own regulations.'

Id.

170.    intentionally left blank

171.    Accordingly, the Court should find the contracting officer's grounds for denial are illegal, violating FAR 16.203-1 and 16.203-2.

## COUNT V
### (Breach of Contract:  Reading out of the Contract, Entire EPA Clause, ¶ (g)(4))

172.    The facts set forth in paragraphs 1 through 90, 91-97, 101, 104, 116, 118-120 and 134-136 are incorporated herein.

173.    The contracting officer breached the terms of the Contract, including those of the EPA Clause.

174.    Grounds of the contracting officer's denial are based on illegally reading out of the Contract, EPA Clause, ¶ (g)(4).  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).

175.    Pursuant to EPA Clause, ¶ (g)(4), had the contracting officer not read out the EPA clause denying the claim, DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count I.

176.    Accordingly, the Court should find DLA-E materially breached the Contract in denying DGCI's claim for economic price adjustment.

## COUNT VI
**(Breach of Contract: Reading out Portions of and Inserting Words Into EPA Clause, ¶ (g)(4) and Rendering Meaningless EPA Clause, ¶ (g)(4))**

177.    The facts set forth in paragraphs 1 through 90, 96, 98, 99, 100, 103, 107-115.1, 119.1, 126, 127, 142, 143, 145, 146 and 148 are incorporated herein.

178.    The contracting officer's grounds for denial are a material breach of the Contract as they require reading out various parts of and inserting words into the Contract's EPA Clause, ¶ (g)(4).

179.    The contracting officer's grounds for denial are a material breach of the Contract as they render meaningless, useless and ineffective the Contract's EPA Clause, ¶(g)(4).

180.    The contracting officer's "unexpressed, subjective unilateral intent . . . is insufficient to bind the other contracting party, . . . ."  Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.3d 547, 551 (1971).  See Mayvin, Inc. v. United States, 2025 WL 2371075, at *9 (Fed.Cl. 2025), quoting, United States v. Menasche, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section, as the Government's interpretation requires." (citation omitted) (quoting Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).  See Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005), where the Federal Circuit states:

> "When there is no ambiguity in the meaning of the regulation, " 'it is the duty of the courts to enforce it

> according to its obvious terms and not to insert words and
> phrases so as to incorporate therein a new and distinct
> provision.' " Gibson v. United States, 194 U.S. 182, 185, 24
> S.Ct. 613, 48 L.Ed. 926 (1904); *see also* United States v.
> Temple, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967
> (1881).
>
> The meaning of the regulations governing the use of EPA
> clauses is plain and we reject [an] . . . invitation to insert
> words into the regulation to alter that meaning.

See also, Ingham Reg. Med. Center v. United States, 163 Fed. Cl. 384, 400 (2022) ("The

court may not change the plain meaning of the letter by adding language.").  See also,

Mellon Bank, N.A. v. United States, 47 Fed. Cl. 186, 191 (2000) (a "proposed

interpretation of the second prerequisite in I.R.C. § 67(c)(1) can be faulted not only for

adding words and concepts that unambiguously are not included in the statutory wording,

. . . ."); George Hyman Const. Co. v. United States, 832 F.2d 574, 581 (Fed. Cir. 1987)

("If we accepted this argument, we would have to rewrite the contract, and words the

parties never agreed to, which we do not have the authority to do.")

181.    "[A] court should reject any interpretation which would render portions of

the contract meaningless, useless, ineffective, or superfluous."  Boehm v. United States,

22 Cl.Ct. 511, 516 (Cl.Ct.,1991), citing, United Pac. Ins. Co. v. United States, 497 F.2d

1402, 1405, 204 Ct.Cl. 636 (1974); Restatement (Second) of Contracts § 203(a) (1981).

See also, Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1201 (Fed. Cir. 2006)

(finding "[b]ecause the government's interpretation would render that portion of the

Contract meaningless and superfluous, it is not reasonable. [The contractor's] . . .

interpretation, on the other hand, preserves the meaning of each provision of the Contract

and is therefore the only reasonable interpretation proposed by the parties.")

182.    Pursuant to EPA Clause, ¶ (g)(4), had the contracting officer not read out various parts of and inserted words into EPA Clause, ¶ (g)(4),  and rendered meaningless EPA Clause, ¶ (g)(4), DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count I.

183.    Accordingly, the Court should find DLA-E materially breached the Contract in denying DGCI's claim for economic price adjustment.

## COUNT VII
### (DLA-E's Denial is Unreasonable)

184.    The facts set forth in paragraphs 1 through 90, 96 and 104-106 and 116-119 are incorporated herein.

185.    The contracting officer's ground for denial, that DGCI's offer failed to include a contingency amount based on a prediction of OPDC prices runs contrary to the reason for inclusion of the EPA Clause in the Contract – the market changes are seriously unpredictable.

186.    The contracting officer's grounds for denial are unreasonable, violating the procurement principle that a contracting officer may not second guess a bidder's business judgment on how it will formulate its price amount nor require an offeror to change its price.  See Southwest Truck Body Company, B-208660, September 8, 1982, 82-2 CPD ¶ 212 at 3 ("[H]ow a bidder arrives at its bid price is a matter of business judgment which is not subject to question by the contracting officer.")  See also, FAR 15.307(b) (contracting officer may "give[] an opportunity to submit a final proposal revision" and not require an offeror to change its price.)

187.    The contracting officer's grounds for denial, that DGCI should have taken exception to the EPA clause – which is predicated on the suggestion that the EPA Clause

is discretional – runs contrary to the procurement principle that (i) an EPA clause is a "mandatory contract provision that significantly affects the legal rights of the government and the legal obligations of the contractor." American Engineered Solutions, B-289051, December 20, 2001, 2001 CPD ¶ 207 at 4, and (ii) had DGCI taken exception DLA-E could have rejected DGCI's proposal submission. Pleasey Electronic Systems Corp., B-236494, September 11, 1989, 89-2 CPD ¶ 226 at 2 ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of a solicitation should be considered unacceptable and may not form the basis for an award.") See also, Advanced Management Strategies Group, Inc., B-423290, B-42390.2, April 16, 2025, 2025 CPD ¶ 80 at 7 ("A proposal or quotation that takes exception to a solicitation's material terms and conditions should be considered unacceptable and may not form the basis for an award.")

188.    The contracting officer's denial on the ground that DGCI should have filed a solicitation protest challenging the legality of PLATTS differs from a monetary claim for economic price adjustment under EPA Clause, ¶ (g)(4).

189.    The contracting officer's grounds for denial  are unreasonable, failing to read the solicitation as a whole, in a manner that gives meaning to all its parts.  See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (interpretation "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.")

190.    Pursuant to EPA Clause, ¶ (g)(4), had the contracting officer acted reasonably, DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count I.

191.    Accordingly, the Court should find the contracting officer materially breached the Contract in denying DGCI's claim for economic price adjustment.

## COUNT VIII
### (Breach of Implied Duty of Good Faith and Fair Dealing)

192.    The facts set forth in paragraphs 1 through 148 are incorporated herein.

193.    The contracting officer breached his implied duty of good faith and fair dealing reflected by the COFD's fundamentally, unreasonable grounds for denial. Multiple times, the COFD's grounds for denial read out the Contract's EPA Clause, ¶ (g)(4), insert words and phrases into and remove words and phrases from the EPA Clause, eviscerating the method of analysis of EPA Clause (g)(4), rendering EPA Clause (g)(4) meaningless, violating fundamental concepts of economic price adjustment under FAR 16.203-1 and 16.203-2 and basic government contract principles all of which the contracting officer did in the enforcement of the Contract's EPA Clause, to escape liability. And, all the while DLA is asserting an interpretation of EPA Clause ¶ (g)(4) contrary to its own understanding.  See, Williams Alaska Petroleum, Inc. v. U.S., 57 Fed. Cl. 789, 800 (2003), quoting DESC's Memorandum of May 12, 1995.

194.    The contracting officer breached his duty of good faith and fair dealing in the enforcement of the Contract's EPA Clause by denying DGCI's claim for economic price adjustment under EPA Clause, ¶ (g)(4), based on the assertion that DLA-E would have terminated DGCI's requirements Contract and resolicited because substituting OPDC for PLATTS changes the terms upon which the competing offerors prepared proposals.  As alleged herein, substitution would not change such terms.  Such a termination would be only for the purpose of shopping for a lower price after award in order for DLA-E to escape its contractual obligation to compensate DGCI under the EPA Clause.  The termination

plan disclosed by DLA-E reflects that it had entered into the Contract with DGCI with no intention of fulfilling its promise under EPA Clause, ¶ (g)(4), a breach of DLA-E's duty to deal with DGCI fairly and in good faith. See e.g., Krygoski Const. Co., Inc. v. United States, 94 F.3d 1537, 1545 (Fed. Cir. 1996) (explaining that under Torncello, a termination for convenience is not recognized where the basis for the termination reflects that the Government "enter[ed] a contract with no intention of fulfilling its promises.") See also, Salsbury Industries v. United States, 905 F.2d 1518, 1512 (Fed. Cir. 1990 (explaining that Torncello "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause.")

195.    "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205, quoted in Metcalf Const. Co., Inc. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014).

196.    The contracting officer breached his implied duty of good faith and fair dealing in the enforcement of the Contract's EPA Clause, ¶ (g)(4).

197.    DLA-E breached its implied duty of good faith and fair dealing through its "evasion of the spirit of the bargain." Restatement (Second) of Contracts § 205.

198.    "[B]reach of the implied covenant of good faith and fair dealing consists of dishonest conduct such as . . . [as here, DLA-E is] asserting an interpretation contrary to one's own understanding . . . ." Restatement (Second) of Contracts ¶ 205.

199.    DLA-E breached the implied covenant of good faith and fair dealing, acting in a manner so "as to destroy the reasonable expectations of [DGCI] . . . regarding the fruits of the contract, [for example, where, as here, DLA-E is liable to DGCI for the claim for

economic price adjustment under EPA Clause, ¶ (g)(4).]"  <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

200.    Pursuant to EPA Clause, ¶ (g)(4), had the contracting officer complied with his implied duty of good faith and fair dealing, DLA-E would be liable to DGCI for recovery of the economic price adjustment as shown in Count 1.

201.    Accordingly, the Court should find the contracting officer materially breached the contract by breaching his duty of good faith and fair dealing.

<b><u>REQUEST FOR RELIEF</u></b>

WHEREFORE, Plaintiff prays that this Court grant Plaintiff the following relief:

1.    Issue a decision finding that Defendant is liable to Plaintiff for recovery of the economic price adjustment as shown in Count 1, plus interest under the CDA, and issue an Order awarding Plaintiff said claim amount plus interest.

2.    Issue a decision finding against Defendant and in favor of Plaintiff on all Counts.

3.    Enter judgment in Plaintiff's favor, awarding Plaintiff recovery of the economic price adjustment as shown in Count 1, plus interest under the CDA, attorney fees and costs.

4.    Set-aside the COFD.

5.    Grant such other relief as the Court may deem just and proper.

Dated:  December 10, 2025.

Respectfully Submitted,

s/Lawrence J. Sklute

Lawrence J. Sklute, Attorney of Record
SKLUTE & ASSOCIATES
12505 Park Potomac Avenue, Suite 600
Potomac, Maryland 20854
Office: (202) 637-1223
E-Mail: Sklute@FedGovContractsLaw.com

Counsel for DGCI Corporation